# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

THE WARD ORGANIZATION, LLC, et al., )
              )
  Plaintiffs, )
              )
v. )   Civil Case No. 3:26-cv-00202
              )
STONEBRIAR COMMERCIAL )   Judge Richardson
FINANCIAL, LLC, et al., )
              )
  Defendants. )

## MOTION AND MEMORANDUM OF LAW FOR APPOINTMENT OF RECEIVER

Plaintiffs[1] respectfully move this Court pursuant to Federal Rule of Civil Procedure 66, 28 U.S.C.§§ 754 and 959, 18 U.S.C. § 1964(a), and the Court's inherent equitable authority for appointment of a neutral receiver to preserve, stabilize, and protect the property and party interests in this action, and would show as follows:

## I. INTRODUCTION

This case concerns a high-value dispute over governance and control of the Encore Enterprise[2], a Nashville-based luxury motorcoach operation serving the entertainment industry,

---

[1] Plaintiffs refers to all Plaintiffs, The Ward Organization ("TWO"), Encore Luxury Coach Leasing, TN, Inc., ("Encore TN"), TWO Shared Services, LLC, Encore Fleet Services, LLC, Encore Conversion Group, LLC, Encore Executive Fleet, LLC, Cleet CO20, LLC, ADW2021, LLC, WEC23, LLC, TPMP 2023, LLC; ADWEB2022, LLC, Dawn Day LLC, ACBI, LLC, Motorcoach Finance, LLC, Good Louis Holdings, LLC, Little Creek CRE LLC, B4S Holdings, LLC, Justin Ward ('Ward') Amanda Williams ("Williams").

[2] The Encore Enterprise includes, *inter alia,* all of the Entity Plaintiffs named in this matter: Encore TN, TWO, Encore Fleet Services, LLC, Encore Executive Fleet, LLC, Encore Conversion Group, LLC, FleetCo20, LLC, ADW2021, LLC, WEC23, LLC, TPMP, LLC, ADWEB2022, LLC, Dawn Day, LLC, ACBI, LLC, Motor Coach Finance, LLC, B4S Holding,

1

composed of a series of entities. The parties assert competing rights to control business operations, financial accounts, and control to Tennessee property and assets based in Tennessee. Tens of millions of dollars are in controversy. Furthermore, the Defendants[3] have engaged in fraudulent, unethical and bad faith conduct which has caused substantial damage to the value of the Encore Enterprise. The Defendants have improperly seized control over the Encore Enterprise via a conspiracy culminating in a wrongful invocation of proxy rights.

Likewise, recent events reflect escalating assertions of authority. The actions of the Defendants have created operational instability, vendor confusion, and potential harm to the Encore Enterprise as a going concern. Rather than permitting unilateral control by either party while the merits are litigated, the appointment of a neutral receiver is the most appropriate mechanism to preserve and stabilize the business pending adjudication.

## II.  FACTUAL BACKGROUND

### A.  The Parties and the Encore Enterprise

Plaintiff Justin Ward ("Ward") is a Tennessee resident and the founder, Managing Member, and sole Member of The Ward Organization, LLC ("TWO"), a Delaware limited liability company registered to do business in Tennessee with its principal address at 7454 Old Hickory Blvd., Whites Creek, Tennessee 37189. Ward is also the Director and sole voting shareholder of Encore Luxury Coach Leasing TN, Inc. ("Encore TN"), the operating company through which the Encore Enterprise conducts its luxury entertainer motorcoach leasing business. Ward holds one hundred percent (100%) of the membership interests in TWO and all

---

LLC, and Little Creek CRE, LLC.  With the exception of Encore Conversion Group, LLC, the principal place of business all of the entities that make up the Encore Enterprise is Tennessee.
[3] Defendants refers to all Defendants, Eldridge Capital Management, LLC ("Eldridge") Stonebriar Commercial Finance, LLC (Stonebriar"), Timothy Connor ("Conner"), Jeffrey Wilkison ("Wilkison"), David Carter ("Carter") and Blaine Hirsch ("Hirsch").

voting shares of Encore TN, interests he has held continuously throughout the events described herein. As TWO's sole owner and Encore TN's controlling shareholder, Ward has direct personal knowledge of the Encore Enterprise's operations, financial condition, and business relationships. (Decl. Ward, pp. 1-2, ¶¶ 2–5.)

Plaintiff Amanda Williams ("Williams") is a resident of Cornelius, NC. Williams holds membership interests in several entities associated with the Encore Enterprise,. She also holds a convertible note issued by TWO with an approximate value of $6,000,000. From approximately 2021 through early 2025, Williams served as President of TWO and Encore TN, then transitioned to Chief Operating Officer ("COO") of TWO and the Encore Enterprise. In her roles, Williams is responsible for overseeing daily operations, managing client relationships with touring artists and managers, coordinating vendor and operational logistics, and participating in strategic planning and financial management. (Decl. Williams, pp. 1-2, ¶¶ 2–5.)

The Encore Enterprise is a luxury entertainer motorcoach leasing business operating from its principal facility at 7454 Old Hickory Blvd., Whites Creek, Tennessee 37189 (the "Encore Facility"). The Encore Enterprise serves high-profile clients in the touring music and entertainment industry and derives its value not only from its fleet of luxury motorcoaches but critically from its brand reputation, long-term client relationships with touring artists and their management teams, and specialized operational infrastructure — intangible assets that are irreplaceable and cannot be compensated through a damages award after the fact. (Decl. Ward, pg. 4, ¶ 8; Decl. Williams, pp. 2-3, ¶ 7.)

**B.      The Acquisition of Nitetrain and the Stonebriar Loan**

On August 31, 2023, TWO acquired Nitetrain Coach Company, Inc. ("Nitetrain") — including the luxury entertainer coach fleet managed by Nitetrain and owned by affiliated

3

entities, and the commercial real estate from which Nitetrain operated — pursuant to an Equity and Asset Purchase Agreement (the "Acquisition"). Stonebriar Commercial Financial, LLC ("Stonebriar") funded the Acquisition pursuant to a Term Loan Agreement dated August 31, 2023 (the "Loan Agreement") among Stonebriar, TWO, and Defendant Timothy Conner ("Conner"). Approximately $67 million of the total Acquisition purchase price was attributed to Nitetrain's fleet of 123 coaches. (Decl. Ward, pg. 4, ¶ 9; Decl. Williams, pg. 3, ¶ 8.)

As part of the purchase price, TWO paid approximately $45 million through a series of Seller Notes to Conner, including a $5 million holdback note, a $30 million note, and a $10 million note. Stonebriar proposed and approved this structure and acted as Conner's agent with respect to the Seller Notes. The acquisition price attributed to the Nitetrain fleet was premised on Conner's representations and warranties that the coaches were structurally sound and in reasonably good operating condition, that none required repairs beyond ordinary routine maintenance, and that all were sufficient for continued post-closing operations. Those representations were false. (Decl. Ward, pp. 4-5, ¶ 10; Decl. Williams, pg. 3, ¶ 9.)

Following the Acquisition, TWO discovered that a significant number of the 123 entertainer motorcoaches purchased from Nitetrain were not in reasonably good operating condition and could not be placed into service without substantial repair and maintenance work. Many coaches required extensive mechanical repair, overhaul, and even structural work before they could be used for touring operations. These conditions materially reduced the number of fleet units available for revenue-generating tours and required substantial expenditures to restore the fleet to operational condition — all inconsistent with Conner's representations during the Acquisition process. (Decl. Ward, pg. 5, ¶ 11; Decl. Williams, pg. 4, ¶ 10.)

Ward invested more than $8,000,000 in personal capital in connection with the Acquisition and, as of October 2025, estimated his ownership interest in the Encore Enterprise at no less than $175,000,000 — substantially in excess of the outstanding Stonebriar loan balance. (Decl. Ward, pg. 3, ¶ 6.)

**C.** **Stonebriar's Pre-Takeover Conduct: The Settlement and the Scheme**

On March 12, 2025, Stonebriar executive Jeffrey Wilkison ("Wilkison") called a meeting at the Encore Facility, attended by Conner, Wilkison, Defendant Blaine Hirsch ("Hirsch") and Daniel Lewis ("Lewis") of Stonebriar, and Defendant David Carter ("Carter"), ostensibly to address the cancellation of Conner's Seller Notes arising from his misrepresentations. Despite that TWO possessed the indemnification claims against Conner, Stonebriar instructed TWO and Ward to cease all contact with Conner and represented that it would conduct all negotiations on TWO's behalf. Hirsch separately told Ward that Stonebriar was working toward a resolution of TWO's claims against Conner and asked Ward to be patient, tying any forbearance agreement to that resolution. (Decl. Ward, pg. 5, ¶ 12; Decl. Williams, pg. 4, ¶ 11.)

On July 3, 2025, a Settlement Agreement ('Settlement Agreement") was executed resolving TWO's indemnification claims against Conner for a total price reduction of $40 million — approximately $35 million below the face amount of the Seller Notes. That settlement was negotiated exclusively by Stonebriar, which was simultaneously acting as Conner's agent on the Seller Notes and as TWO and Encore's secured lender and purported fiduciary. The Settlement Agreement required TWO to waive all indemnification claims against Conner while releasing Conner from liability. In hindsight — confirmed by Conner's own sworn declaration filed in New York on January 20, 2026 — Conner had been discussing with Stonebriar his contemplated future operational control of Encore at approximately the same time the Settlement Agreement

5

was being negotiated. The settlement, in effect, cleared the path for the takeover that followed. (Decl. Ward, pp. 5-6, ¶ 13; Decl. Williams, pp. 4-5, ¶ 12.)

In early October 2025, TWO requested that Stonebriar provide an accounting — or even an estimate — of what it believed was owed under the Loan Agreement following the $40 million Seller Note reduction. Stonebriar refused and never produced any calculation of the amounts it contended were owed, despite repeated requests from TWO management. As of the November 6 dinner described below, Stonebriar remained unable or unwilling to provide any loan accounting. (Decl. Ward, pg. 6, ¶ 14; Decl. Williams, pg. 5, ¶ 13.)

As of October 2025, and notwithstanding the post-Acquisition MRO disruptions, the Encore Enterprise had substantially stabilized and was on a financially improving trajectory. The Encore Enterprise operated a fleet of approximately 140 luxury entertainer motorcoaches expected to be in service for the 2026 touring season, with 14 additional units scheduled for disposal under an ongoing fleet rationalization program. The Encore Enterprise employed more than 250 people, and was on track to generate more than $70 million in revenue during the 2026 touring cycle. The extraordinary MRO work required to restore the purchased Nitetrain fleet to operational condition was largely complete, and capital requirements for new coach conversions were increasingly being financed through third-party arrangements rather than operating cash flow. Ward provided Stonebriar with a detailed report reflecting these improvements and demonstrating that TWO expected to resume debt service payments in 2026 consistent with the parties' prior understanding. (Decl. Ward, pg. Pp. 6-7, ¶ 15; Decl. Williams, pg. 5-6, ¶ 14.)

**D.** **The November 6, 2025 Ambush**

On the evening of November 6, 2025, Stonebriar and Eldridge Capital Management, LLC's ("Eldridge"), Stonebriar's parent company, executives Hirsch, Wilkison, and Lewis

invited Ward and Encore TN CFO Christopher Weatherspoon to dinner at a public Nashville restaurant under the false pretext of discussing Ward's recent lender report and preparing for a management meeting the following day regarding loan restructuring. Ward appeared at that dinner in good faith, expecting a substantive discussion about the Encore Enterprise's demonstrated reconciliations of the problems caused by Connor and the path forward on restructuring. (Decl. Ward, pg. 7, ¶ 16; Decl. Williams, pg. 6, ¶ 15.)

What followed was a coordinated ambush. Upon arrival, Hirsch directed Weatherspoon to sit at the bar, isolating Ward. Hirsch then presented Ward with a manila envelope containing a document titled "Your Circumstances," along with a draft settlement agreement and a draft assignment of membership interests — demanding that Ward and Williams immediately surrender all ownership interests in TWO and the Encore Enterprise to Stonebriar. When Ward declined, Hirsch announced that Stonebriar was purporting to exercise proxy and power-of-attorney provisions under the Guaranty and Security Agreement to seize control of TWO and Encore TN immediately, without legal process and without any court order. Hirsch declared Ward immediately removed as CEO and barred him and Willaims from the Encore Facility and all business systems. He handed Ward a written notice of termination and a "No Trespass Notice and Directive" prohibiting Ward from entering his own offices. Hirsch then stated that Stonebriar would hold both Ward and Williams personally liable for the full loan balance — which Stonebriar characterized as exceeding $156 million — unless they surrendered their ownership interests on the spot. Critically, even at this moment of maximum pressure, Stonebriar was still unable to provide any accounting of the amounts it alleged was owed. (Decl. Ward, pp. 7-8, ¶ 17; Decl. Williams, pp. 6-7, ¶¶ 16–17.)

Williams was simultaneously ousted from her position as COO of TWO, without prior notice or any basis for termination, or any indication she would be barred from the business premises. (Decl. Williams, pg. 7, ¶ 18.)

While Ward was being held at the restaurant under the pretext of a restructuring discussion, Stonebriar dispatched armed personnel to the Encore Facility in Whites Creek, Tennessee. This deployment occurred without legal process, without a court order, and without any legitimate business justification — in direct contradiction of Stonebriar's repeated representations over the preceding year that it would cooperate with management to restructure the debt following the $40 million reduction of Conner's Seller Notes. Ward had relied on those representations when agreeing to the Settlement Agreement that Stonebriar negotiated. Williams learned of the armed guards through communications from company employees and others present at the Encore Facility. (Decl. Ward, pg. 8, ¶ 18; Decl. Williams, pp. 7-8, ¶¶ 19–20.)

On or about November 7, 2025, Stonebriar installed Conner — the very individual whose fraudulent misrepresentations created the financial difficulties at the heart of this case, and whose own sworn declaration confirms he had been coordinating his return to control with Stonebriar for months — as the operational head of the Encore Enterprise. (Decl. Ward, pg. 8, ¶ 19; Decl. Williams, pg. 7, ¶ 20.)

E.      **The Post-Takeover Destruction of Enterprise Value**

Post November 6, 2025, Ward and Williams have been completely barred from the Encore Facility and denied all access to the Encore Enterprise's business systems, financial records, and operational communications. Neither has received any financial reporting, including K-1s or other financial documents necessary to file tax returns on behalf of the Encore

8

Enterprise. The following categories of harm are ongoing, accelerating, and increasingly irreversible. (Decl. Ward, pg. 9, ¶ 20; Decl. Williams, pg. 8, ¶ 21.)

### 1. Armed Guards and Reputational Damage

The posting of armed personnel at the Encore Facility on November 6 was immediately visible to employees, vendors, and industry contacts. The luxury entertainer motorcoach industry operates on trust, discretion, and long-term personal relationships with touring artists and their management teams. Visible signs of operational distress in this industry are catastrophic and spread instantly. Within days of the takeover, rumors circulated throughout the touring artist community that the Encore Enterprise was in financial distress and unable to honor its contractual commitments — regardless of whether those rumors were accurate, which they were not. In an industry where reputation is the primary business asset, that reputational damage is itself an irreparable harm. (Decl. Ward, pg. 9, ¶ 21; Decl. Williams, pg. 9, ¶ 23.)

### 2. Mass Layoffs Stripping Institutional Knowledge and Client Relationships

Following the takeover, Defendant Carter — appointed interim CEO by Wilkison — terminated TWO and the Encore Enterprise's entire executive team and conducted mass layoffs throughout the organization. Dozens of employees who collectively embodied years of institutional knowledge, client relationships, and operational continuity have been terminated since November 6, 2025. These losses cannot be quickly reversed. (Decl. Ward, pg. 10, ¶ 22; Decl. Williams, pg. 10, ¶ 24.).

### 3. Brand Sabotage and Active Dismantling of the Encore Identity

Carter, acting at Stonebriar's direction, installed Conner as operational head of the Encore Enterprise immediately after the takeover. What followed was a systematic dismantling of the Encore brand. Conner publicly declared that "Nitetrain was coming back," replacing Encore

9

branding with Nitetrain branding at company facilities and on fleet assets, removing Encore license plates from fleet units, and replacing the "JW" naming conventions previously used on Encore fleet band trailers with "TC" (for Tim Conner). Encore-branded merchandise and equipment worth tens of thousands of dollars was disposed of. (Decl. Ward, pp. 9–10, ¶ 23; Decl. Williams, pp. 10, ¶ 25.)

The physical evidence of this brand destruction is documented. When Williams re-entered the Encore Facility on February 5, 2026, the first thing visible to anyone entering the front office was Nitetrain signage — there was no Encore signage anywhere, a condition that had persisted since November 6, 2025. (Decl. Williams, pg. 10, ¶ 25; Ex. A (photograph of Encore Facility front office, February 5, 2026)). When Williams caused the Nitetrain signage to be replaced with Encore signage that same day, Conner directed employees to change it back to Nitetrain. (Decl. Williams, pp. 10-11, ¶¶ 25–26; Ex. C (still photograph from video footage of Encore Facility front office, February 5, 2026, confirming reversal back to Nitetrain))

Conner continued to speak untruthfully about Nitetrain and Encore in sworn testimony in at least two courts. On February 24, 2026, Conner affirmatively represented under oath in Texas proceedings, that Encore was still being held out as Encore and denied ever attempting to change any signage or documentation from Encore to Nitetrain — testimony directly and visually contradicted by the photographic evidence described above. (Decl. Williams, pg. 11, ¶ 26; Ex. B[4]).  In his separately filed sworn declaration in New York on January 20, 2026, Conner further made the false assertion that Stonebriar "owns TWO" and confirmed he had been conveying this representation to clients. (Decl. Williams, pg. 11, ¶ 27; Ex. D[5]). These false representations have

---

[4] See Exhibit B, pg. 111, lines 4-25, and pg. 114, lines 8-9.
[5] See Exhibit D, pp. 12-13, ¶ 69.

further damaged the Encore Enterprise's standing, client relationships, and ability to operate as a going concern. (Decl. Ward, pg. 11, ¶ 24; Decl. Williams, pg. 11, ¶¶ 26-27.)

### 4. The George/TCS Client Diversion Scheme

Among the most damaging ongoing acts is the active diversion of the Encore Enterprise's client relationships during the critical 2026 tour booking cycle. Jennifer George, a leasing agent formerly associated with Conner, has been directing existing and prospective Encore clients to Transportation Charter Services ("TCS"), a company owned by Terry Fischer, a Conner associate. The touring music industry operates on seasonal booking cycles in which transportation providers are selected months in advance of a tour. Once those commitments are made to another provider, they are typically not recoverable for the remainder of the touring season. The diversion of these relationships during the current booking window causes permanent and irreparable harm. This conduct is ongoing and, absent receivership, will continue to divert the Encore Enterprise's clients and revenue opportunities throughout the remainder of the 2026 season. (Decl. Ward, pp. 11, 16, ¶¶ 25, 33; Decl. Williams, pp. 11-12, ¶¶ 28–29.)

The financial consequences of these combined harms are material and accelerating. Based on internal booking records, historical touring schedules, and client commitments that existed prior to November 6, 2025, the Encore Enterprise was projected to generate more than $70 million in revenue during the 2026 touring cycle. Since the takeover, the Encore Enterprise's projected revenue has been materially reduced — by approximately one-half of the pre-takeover projection, representing the loss of roughly $30–35 million in expected touring revenue for the 2026 season alone. This decline is reflected in both Ward's direct knowledge of the company's booking activity and in the preliminary financial assessment conducted by CR3, a restructuring and financial advisory firm that had been engaged by the Defendants, with agreement from the

Plaintiffs. Even within CR3's limited engagement scope — after Stonebriar and Eldridge withdrew their agreement to install CR3 as Chief Restructuring Officer and limited the firm to a short preliminary assessment — CR3's financial review reflected the deterioration in projected operating performance following the takeover. (Decl. Ward, pp. 11-12, ¶ 26.)

### 5. Asset Misappropriation: WTA/ECG Prevost Shell Units

Stonebriar and Conner have also misappropriated assets belonging to entities that are not parties to the Loan Agreement or Security Agreement. Prior to November 6, 2025, WTA 25, LLC ("WTA"), an entity owned and controlled by Ward, negotiated a separate loan agreement with Peachtree under which WTA borrowed funds to be used by Encore Conversion Group, LLC ("ECG") to convert specific Prevost Shell vehicles into luxury entertainer coaches, to be owned by WTA and managed by Encore TN. These units were delivered to ECG's headquarters in Cornelius, NC. On information and belief, Stonebriar and Conner failed to use these Peachtree loan funds for their contractually obligated purpose, removed the Prevost Shell units from the Cornelius, NC facility and transported them to Tennessee, and failed to fulfill the Peachtree loan obligations despite seizing the funds. On information and belief, Conner and Carter — acting for Stonebriar — shut down the North Carolina facility on November 7, 2025 and terminated nearly all employees there that same day. Separate litigation has been filed to address this situation. (Decl. Ward, pp. 13-14, ¶¶ 27-28; Decl. Williams, pp. 12-13, ¶¶ 30–31.)

### 6. Excessive Management Overhead During Operational Decline

Based on Ward's knowledge of the Encore Enterprise's operations, the management personnel installed by Stonebriar following the takeover — including Conner, Carter, and Jonathan Thornton — are costing the Encore Enterprise more than $1,000,000 annually in compensation and related expenses while the Encore Enterprise's revenue trajectory declines and

operational instability increases. This is in stark contrast to Ward and Williams' historical approach: during the difficult post-Acquisition period when extraordinary MRO expenditures were required, Ward and Williams repeatedly deferred or reduced their own compensation and repeatedly injected additional personal capital to support the enterprise. If a receiver is appointed, Ward and Williams stand ready to support the receiver's stabilization efforts and would again be willing to defer compensation to reduce overhead. (Decl. Ward, pp. 18-19, ¶ 39.)

### F. The Parallel Texas Proceedings Initiated by Stonebriar

On November 18, 2025, Stonebriar filed two separate Verified Petitions and Applications for Temporary Restraining Order in the Business Court of Texas — against Ward (Case No. 25-BC01B-0055) and against Williams (Case No. 25-BC01A-0059). On February 6, 2026, after Ward and Williams reentered the Encore Facility with Tennessee law enforcement, Stonebriar sought a TRO and injunctive relief that would purport to authorize its continued unilateral control over the Encore Enterprise — the same assets at issue in this federal action. Stonebriar did not name TWO (the actual borrower under the Loan Agreement) or any of the Encore Enterprise entities as defendants, though it sought to control all of their assets. That TRO was granted on an interim basis and a hearing occurred on February 24, 2026. The Court ultimately denied the request for a TRO. (Decl. Ward, pg. 16, ¶ 32; Decl. Williams, pg. 14, ¶ 33.)

Williams removed Case No. 25-BC01A-0059 to the United States District Court for the Northern District of Texas, staying the TRO proceedings during that removal. On March 9, 2026, the federal court in Texas entered an order remanding the case back to the Texas Business Court. (Decl. Williams, pp.14-15, ¶ 34; Exhibit E.). That same day, Stonebriar filed an emergency motion to expedite the remand proceedings. That Motion was granted and the matter was remanded on March 12, 2026. (Decl. Williams, pp. 14-15, ¶ 34; Exhibit F.)

### III. __ARGUMENT__

#### A. __Standard For Appointment of a Receiver__

Federal courts are not bound by state law in determining whether a receivership should be granted; the appointment itself is measured by federal equitable standards. *Resolution Trust Corp. v. Fountain Circle Assocs. Ltd. P'ship*, 799 F. Supp. 48, 50 (N.D. Ohio 1992); *Patel v. AR Group Tennessee, LLC*, No. 3:20-cv-00052, 2020 WL 5849346, at *9 (M.D. Tenn. Oct. 1, 2020); *Federal Nat'l Mortg. Ass'n v. Mapletree Investors Ltd. P'ship*, No. 09-cv-11366, 2010 WL 1753112 (E.D. Mich. Apr. 30, 2010). This rule applies regardless of whether federal jurisdiction is grounded in diversity or federal question — the appointment is a procedural matter governed by federal equitable principles in either case. *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316–17 (8th Cir. 1993); *National P'ship Inv. Corp. v. National Hous. Dev. Corp.*, 153 F.3d 1289 (111th Cir. 1998).

Federal Rule of Civil Procedure 66 authorizes the appointment of receivers and provides that the practice in administering a receivership estate must accord with historical federal court practice or with a local rule. A district court "enjoys broad equitable powers to appoint a receiver over assets disputed in litigation before the court." *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006). The purpose of a receivership is "to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary." *Id*.

In evaluating whether a receiver should be appointed, courts consider multiple factors, including: (1) the validity of the claim by the party seeking appointment; (2) the probability that fraudulent conduct has occurred or will occur to frustrate the claim; (3) imminent danger that property will be lost, concealed, injured, diminished in value, or squandered; (4) the inadequacy

14

of available legal remedies; (5) the lack of less drastic equitable remedies; and (6) the likelihood that appointment of a receiver will do more good than harm. *Patel*, 2020 WL 5849346, at *9; *Steinberg v. Young*, 641 F. Supp. 2d 637, 641 (E.D. Mich. 2009).

Additionally, in RICO actions, 18 U.S.C. § 1964(a) expressly grants district courts the power to "issue appropriate orders" in RICO cases, which may include orders involving dissolution, reorganization, or, by extension, the appointment of a receiver to manage a RICO enterprise. *United States v. Ianniello*, 824 F.2d 203, 208 (2nd Cir. 1987) (district courts have "considerable discretion to frame the scope of a receivership" in RICO cases). Here, the plaintiffs have plead, in the alternative, that the Encore Enterprise is the RICO Enterprise.

The current situation presents a risk of material injury to the Encore Enterprise absent neutral oversight. There are allegations of substantial, severe fraudulent conduct on the part of Defendants. Furthermore, the Encore Enterprise's value and customer base suffers continued damage so long as the present state of affairs continues. The appointment of a neutral receiver is the appropriate remedy to provide stability and restore customer confidence.

### B.     Plaintiffs Assert Valid, Well-Pleaded Claims

The Complaint presents a pleading that far surpasses the valid-claim threshold required for receiver appointment. The 78-page Complaint alleges civil RICO violations under 18 U.S.C. §§ 1962(b)–(d), grounded in a chronologically documented, three-phase racketeering scheme: (1) fraudulent inducement of a $100 million Acquisition through material misrepresentations about the Nitetrain Fleet; (2) a forbearance fraud that diverted Encore's operating capital and manufactured a pretextual default; and (3) the extortionate, armed, extrajudicial seizure of the Encore Enterprise on November 6, 2025. The RICO claims alone satisfy the valid-claim element for appointing a receiver. Moreover, layered atop those RICO claims are independently viable

15

causes of action for breach of the Loan Agreement, fraudulent inducement, tortious interference, conversion, and waste, each supported by detailed factual allegations.

The "valid claim" element requires only that claims be colorable — not that Plaintiffs prove them at this stage. *De Boer Structures (U.S.A.), Inc. v. Shaffer Tent & Awning Co.*, 187 F. Supp. 2d 910 (S.D. Ohio 2001). Plaintiffs clear that bar by a wide margin. Courts in this Circuit have appointed receivers on far narrower grounds — routine fraud and asset dissipation, without any RICO overlay. See *Patel v. AR Group Tennessee, LLC*, No. 3:19-cv-00404, 2020 WL 1692227, at *3 (M.D. Tenn. Apr. 7, 2020).

Here, Defendants deployed armed personnel to physically bar the lawful owners from the Encore Facility (Decl. Ward, pp. 7-9, ¶¶ 17-18, and 21; Decl. Williams, pp 7-8, ¶¶ 19-20), wrongfully exercised proxy rights they did not lawfully hold (Decl. Ward, pp. 7-8, ¶ 17; Decl. Williams, pp.6-7, ¶ 16), installed their own operatives to dismantle the Encore Enterprise's operations and depress its value (Decl. Ward, pp. 8, 10, ¶¶ 19 and 23; Decl. Williams, pp. 8, 10, ¶¶ 20 and 25), and now claim ownership of an the Encore Enterprise (Decl. Williams, pp. 11, ¶ 27) — all without any court order or any judicial oversight of any kind. The breadth, specificity, and gravity of the underlying claims leave no serious doubt that Plaintiffs' claims are well-pleaded and meritorious.

### C. Fraudulent Conduct Has Occurred and Will Continue

Defendants have engaged in fraudulent activity and have conducted a coordinated scheme ito seize control over the Encore Enterprise. The record already demonstrates a substantial probability — indeed, near certainty — that fraudulent conduct occurred and will continue to frustrate Plaintiffs' claims, including Conner's sworn admission that he had been discussing his anticipated operational control of Encore with Stonebriar at approximately the

16

same time Stonebriar was simultaneously negotiating the Settlement Agreement on TWO's behalf; the deployment of armed guards at the Encore Facility without legal process; Conner's false sworn testimony in Texas denying any signage changes, directly contradicted by photographic evidence; Conner's false public representations that Stonebriar "owns TWO"; and the ongoing diversion of client relationships through the George/TCS scheme. (Decl. Ward, pp. 5-6, 10-11, ¶¶ 13, 23–24; Decl. Williams, pp. 4-5, 10-11, ¶¶ 12, 25–27; see also Exhibits A-D.)

Additionally, federal courts have previously ruled that a receivership is appropriate in a RICO case, stating that a district court has "considerable discretion to frame the scope of a receivership" in RICO cases. *United States v. Ianniello*, 824 F.2d 203, 208 (2nd Cir. 1987). This case includes allegations of RICO activities and deceptive practices. The Defendants have seized control over the Encore Enterprise using deceptive practices, armed guards and improper invocation of proxy rights. As such, the probability of continued fraudulent conduct absent receivership is not merely theoretical — it is already proven by Defendants' conduct.

D. **The Encore Enterprise Is In Imminent Danger of Irreversible Harm**

The Encore Enterprise is not a dormant asset — it is a live, revenue-generating business operation that is being actively destroyed from within by the Defendants. No remedy short of a receiver can halt that destruction. The Encore Enterprise's viability depends upon: stable management; clear authority; vendor and customer confidence; and consistent operational control by management that is serving the interests of the Encore Enterprise, not the Defendants'.

The Encore Enterprise is currently in imminent and continuing danger of being lost, concealed, injured, diminished in value, or squandered within the meaning of the governing standard. See *Patel*, 2020 WL 5849346, at *9; *De Boer Structures*, 187 F. Supp. 2d at 917. Federal courts possess broad equitable authority to appoint receivers where necessary to preserve

17

property and prevent irreparable harm during litigation. Fed. R. Civ. P. 66; *Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006); See also *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316–17 (8th Cir. 1993) (imminent danger to property among key factors for federal receiver appointment).

Here, the Encore Enterprise's going-concern value has already been substantially diminished — projected 2026 revenue has been cut roughly in half, client relationships are being actively diverted during the irreplaceable peak booking season, the Encore brand is being dismantled in real time, and the institutional knowledge embedded in the terminated workforce is being permanently lost. (Decl. Ward, pp. 10-12, ¶¶ 22-23, 25-26; Decl. Williams, pp. 10-11, 13, ¶¶ 25-26, 32.) Each week of continued mismanagement under Conner and Stonebriar's direction compounds the harm. Ward and Williams, based on their years of direct operational experience, attest that the Encore Enterprise is in immediate danger of losing substantial and irreversible going-concern value absent court intervention. (Decl. Ward, pp. 14-15, 16-20, ¶¶ 29, 33-41; Decl. Williams, pp. 13-17, ¶¶ 32, 36-41.)

Both Plaintiffs and Defendants assert rights to exercise control over the Encore Enterprise. Such instability threatens the orderly operation of the enterprise and risks erosion of enterprise value. This creates substantial risk of further, and thereby, severe harm to both immediate business profitability and its long-term prospects. Governance instability and conflicting claims of authority place the Encore Enterprise at risk of material disruption. Indeed, the Encore Enterprise has already suffered substantial damage to its revenue due to the current management and their self-interested conduct. This factor substantially compels the appointment of a receiver.

### E.    Inadequacy of Alternative Remedies

Temporary restraining orders that freeze control in favor of one disputing party do not neutralize the underlying conflict. Nor do they ensure orderly, professional management of the enterprise pending resolution of the merits.  Moreover, a federal receiver appointed by this Court possesses a critical advantage unavailable to any state court: nationwide jurisdiction over all property of the receivership estate. Under 28 U.S.C. § 754, a receiver appointed in any civil action or proceeding involving property situated in different districts shall, upon giving bond as required by the Court and filing certified copies of the complaint and order of appointment in each additional district, be vested with complete jurisdiction and control of all such property with the right to take possession thereof, and shall have capacity to sue in any district without ancillary appointment. Because the Encore Enterprise and the competing parties' claims are multi-jurisdictional — spanning Tennessee, Texas, and potentially other states — a federal receiver operating under § 754 provides the only mechanism by which all relevant assets can be brought under unified court supervision without the need for parallel state-court proceedings.

The harm being inflicted on the Encore Enterprise is not reducible to a money judgment. The touring music industry operates on personal relationships, reputation, and the ability to deliver reliable premium service over sustained touring seasons. Once the 2026 season client relationships being diverted by George to TCS are committed to a competitor, they will not be recoverable for that season and may be permanently lost. Once the Encore brand's reputation for reliability is destroyed in the eyes of touring artists and their management teams — a market in which word of even alleged financial distress travels immediately — no damages award can reconstitute that reputational capital. The ongoing harm is precisely the type that courts have recognized as warranting the extraordinary remedy of receivership: not merely financial loss, but

19

the destruction of intangible business value that cannot be adequately compensated after the fact. (Decl. Ward, pp. 17-20, ¶¶ 34-40; Decl. Williams, pp. 15-16, ¶¶ 35–40.)

A neutral receiver, operating under court supervision, provides, *inter alia*: stabilization; transparency; timely and accurate reporting, protection of asset and asset values; continuity of operations and management who is loyal to the best interest of all stakeholders. No lesser remedy will adequately preserve the Encore Enterprise during active litigation.

### F. No Less Drastic Equitable Remedy Is Available

A temporary restraining order or preliminary injunction freezing control in favor of one party would not neutralize the underlying governance conflict or ensure professional management of a complex operating business with more than 250 employees and a 140-unit fleet operating across the country. Moreover, a TRO cannot provide the nationwide asset jurisdiction that a federal receiver operating under 28 U.S.C. § 754 can provide.

Under 28 U.S.C. § 754, a receiver appointed in any civil action involving property in multiple districts, upon giving bond as required by the court and filing certified copies of the complaint and appointment order in each additional district, is vested with complete jurisdiction and control over all such property with capacity to sue in any district without ancillary appointment. Because the Encore Enterprise and the assets at issue span Tennessee, North Carolina, Texas, and potentially other states, the federal receiver mechanism is the only available tool through which all relevant assets can be brought under unified court supervision without parallel state proceedings.

### G. The Benefit From A Receivership Substantially Outweighs Any Harm

The appointment of a neutral, independent receiver will halt the destruction of going-concern value, restore operational stability, protect client relationships, prevent further asset

dissipation, and provide this Court with an independent and reliable source of information about the Encore Enterprise's actual financial and operational condition — information that Stonebriar and Conner have systematically denied to the enterprise's owners since November 6, 2025. (Decl. Ward, pp. 18-19, ¶ 39; Decl. Williams, pg. 16, ¶ 40.)

Even the loan documents drafted by Stonebriar themselves presume the requisite remedy in a dispute such as this is appointment of a Receiver. Stonebriar cannot credibly claim that a receiver appointment would harm it — because Stonebriar itself drafted and insisted upon receiver appointment as an express contractual remedy, acknowledged it to be "essential," and made it a "material factor" in its decision to extend the loan. (*See* Decl. Williams, pp. 15-17, ¶¶ 35-41, Exhibit G (Guaranty & Security Agreement dated August 31, 2023), at pg. 27, § 17(g)).

Indeed if, as Stonebriar alleges as justification for its wrongful proxy control over Encore, the value of the business is below the value of the loan (Decl. Ward, pg. 7-8, ¶ 17; Decl. Williams, pg. 6-7, ¶¶ 16-17), maintaining the business in a profitable manner will ensure that the Encore Enterprise exists and can make future payments on its loan. In short, the benefit of receivership - preservation of a $175 million enterprise currently being systematically dismantled - vastly outweighs any harm to Stonebriar, which has already acknowledged that a neutral receiver serves its own interests. Exhibit G, pg. 27, § 17(g).

The purpose of the requested receivership is not to adjudicate the merits of the parties' competing claims to control the Encore Enterprise and its various assets. Rather, the appointment of a neutral receiver will preserve the status quo while this litigation proceeds. Absent neutral oversight, the ongoing mismanagement of the Encore Enterprise by the Defendants creates a material risk that business operations will be further disrupted, contractual relationships will further deteriorate, and enterprise value will be further diminished before resolution of the

dispute. Appointment of a receiver will ensure that the Encore Enterprise continues to operate in an orderly manner under the supervision of the Court while the parties' legal claims are adjudicated.

## IV.     SCOPE OF RECEIVERSHIP REQUESTED

Plaintiff respectfully requests appointment of a neutral, independent receiver with authority to:

(1) assume exclusive management and control of day-to-day operations of the Encore Enterprise, including TWO and Encore TN and all the Plaintiffs;

(2) take control of and preserve all financial accounts, assets, books, records, and operational systems belonging to the Encore Enterprise;

(3) maintain and preserve existing contractual relationships with touring artists, tour managers, vendors, and other counterparties;

(4) make personnel decisions necessary to stabilize and operate the Encore Enterprise in the ordinary course, including retention of key personnel;

(5) provide periodic reporting to the Court on the financial and operational condition of the Encore Enterprise;

(6) cooperate with Ward and Williams, who have offered to assist the receiver and defer their own compensation in furtherance of the Encore Enterprise's stabilization; and

(7) act solely to preserve and protect the value of the Encore Enterprise value pending final adjudication of the parties' claims.

## V.     EQUITABLE CONSIDERATIONS

Appointment of a receiver protects all stakeholders, including, *inter alia,*; Employees, Creditors, Customers, Vendors, Contractual counterparties, Plaintiffs and Defendants.  It

22

removes unilateral control from either litigant and ensures that the Court's ultimate adjudication occurs in the context of a preserved and stable enterprise rather than a hollow shell. The Defendants have already demonstrated that it will not manage the Encore Enterprise in a manner that protects its going-concern value — it has installed a discredited operator, dismantled an established brand, conducted mass layoffs, misappropriated assets, and conducted active client diversion. The equities overwhelmingly favor the appointment of an independent fiduciary responsible solely to this Court, not to either party.

## VI.     PROPOSED RECEIVER

Plaintiffs respectfully request that the Court appoint a neutral and independent receiver with demonstrated experience in managing operating businesses of comparable scale and complexity. Plaintiffs propose William Snyder, Senior Managing Director of CR3 Partners. William Snyder has executive and entrepreneurial experience spanning close to 40 years, he has restructured, managed and guided a multitude of companies in a wide variety of industries. Snyder is a broadly experienced restructuring professional who has participated in restructuring of hundreds of companies and has acted as a fiduciary in many cases. Snyder's relevant experience includes: (1) Court-appointed Examiner of Mirant, a $6.5B merchant energy company; (2) Chapter 11 Trustee of email marketing software company; (3) Chapter 11 Trustee of a landfill processing company; (4) Federal Receiver, Newspaper chain; and (5) Corporate Restructuring Offer ("CRO") of the Texas Rangers Baseball Team. Snyder holds a Bachelor of Science degree from Texas A&M University, is a Certified Turnaround Consultant and a Fellow of the American College of Bankruptcy.

Snyder, along with CR3 Partners, was retained by the Defendants in this matter, with agreement from the Plaintiffs to conduct a financial analysis of the Encore Enterprise and

23

provide information and analysis to both Plaintiffs and Defendants. Prior to his retention, the parties to the Loan Agreement, TWO and Stonebriar were negotiating the retention of Snyder as the CRO of the Encore Enterprise pending resolution of the various legal matters. Stonebriar refused to consummate the arrangement. Snyder has spent a considerable amount of time and effort analyzing the Encore Enterprise, discussing the current status with all the current stakeholders and issued a draft report. Snyder already has obtained the necessary institutional knowledge regarding the Encore Enterprise and is positioned to appropriately manage and direct the Encore Enterprise during the pendency of these proceedings.  Snyder has expressed his willingness to serve and is capable of posting any necessary bond.

In the alternative, Plaintiffs welcome the Court's appointment of a receiver of its choosing with demonstrated experience in managing operating businesses of comparable scale and complexity. Any receiver appointed by the Court should be required to post bond in an amount to be set by the Court as a condition of appointment. See 28 U.S.C. § 754.

## VII.  **PRAYER**

WHEREFORE, Plaintiffs respectfully request that the Court:

(1) appoint a neutral receiver pursuant to Fed. R. Civ. P. 66, 18 U.S.C. 1964(a), and this Court's inherent equitable authority, to preserve and stabilize the Encore enterprise pending resolution of the parties' disputes;

(2) vest the receiver with nationwide jurisdiction over all Encore enterprise assets pursuant to 28 U.S.C. 754;

(3) require the receiver to post bond in an amount to be determined by the Court; and

(4) grant such other and further relief as the Court deems just and proper.

24

## VIII. CERTIFICATE OF CONFERENCE [LR 7.01(a)(1)]

On March 20, 2026 at approximately 2:30 p.m. central standard time, the counsels for Plaintiffs and all Defendants met and conferred in person via remote video/audio pursuant to Local Rule 7.01(a)(1). Counsel for Defendants represented that they would oppose the instant motion.

Respectfully submitted,

*/s/ Robert E. Barnes*
Robert E. Barnes
Counsel for Plaintiffs
700 South Flower Street, Suite 1000
Los Angeles, California 90017
Tel: (310) 510-6211
Email: robertbarnes@barneslawllp.com

Dated: March 20, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2026, the foregoing was filed electronically through the Court's CM/ECF system, which will send notice of such filing to all counsel of record.

*/s/ Robert E. Barnes*
Robert E. Barnes