IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| THE WARD ORGANIZATION, LLC, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | NO. 3:26-cv-00202 |
| STONEBRIAR COMMERCIAL FINANCIAL, LLC, et al., | ) ) ) ) | JUDGE RICHARDSON |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiffs filed an "Emergency Motion and Memorandum of Law for Temporary Restraining Order and Preliminary Injunction" (Doc. No. 55, "Motion") pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65.01, together with a proposed temporary restraining order (Doc. No. 55-5, "Proposed TRO") and four exhibits in support of the Motion (Doc. Nos. 55-1 – 55-4), including a declaration by Justin Ward ( Doc. No. 55-1, "Ward Declaration,") and a declaration by Christopher Weatherspoon (Doc. No. 55-4, "Weatherspoon Declaration").

Defendants Stonebriar Commercial Finance, LLC, Eldridge Capital Management, LLC, Jeffrey Wilkinson, and Blaine Hirsch filed a collective response (therein styling themselves as the "Stonebriar Defendants") in opposition to the Motion (Doc. No. 57, the "Response"), along with twenty-seven exhibits, including two declarations, in support of the Response (Doc. Nos. 57-1 – 57-27). Plaintiffs filed a reply in further support of their Motion. (Doc. No. 58, the "Reply"). Defendants David Carter ("Carter") and Timothy Conner ("Conner") filed a separate response to the Motion, therein incorporating by reference the Stonebriar Defendants' Response and stating

that Defendants Carter and Conner "do not assert a position in response to the Motion . . . separate from the position [asserted in the Response]." (Doc. No. 61 at 1).

In an order dated May 27, 2026 (Doc. No. 63), the Court denied the Motion and noted that it would thereafter issue a memorandum opinion explaining the basis of that denial. This is that memorandum opinion.

As indicated by its title, the Motion requests two kinds of temporary equitable relief—a temporary restraining order ("TRO") and a preliminary injunction—to be issued in sequence. More specifically, Plaintiffs[1] request via the Motion that the Court first enter the Proposed TRO until

---

[1] Here, the Motion will repeat remarks regarding the status of Encore Conversion Group, LLC that the Court made in its Order Denying the Motion (Doc. No. 63 at 1 n.1). Those remarks are repeated below verbatim, except that in two places, the Court has removed the word "Luxury" where due to a scrivener's error it was inaptly included as part of the name of Encore Conversion Group, LLC in the Order Denying the Motion:

Encore Conversion Group, LLC is identified in the complaint (Doc. No. 1-1) as both a plaintiff and a "nominal" defendant. Within four days of Plaintiffs' filing of the Motion, attorney Charles W. Cook, III ("Cook") filed a Motion for Admission *Pro Hac Vice* for attorney Grant Schmidt on behalf of "*defendant* Encore Conversion Group, LLC" (Doc. No. 59) (emphasis added). That same day, Cook, Daniel H. Puryear, and Grant Schmidt filed a "Notice Regarding Representation of *Plaintiff* Encore Conversion Group, LLC" (Doc. No. 60, "ECG Notice") (emphasis added). This creates some confusion because Encore Conversion Group, LLC, to the extent that it is a plaintiff, would seem to be represented by plaintiffs' counsel, which is R. Mark Donnell, Jr., Robert E. Barnes, and Christopher P. Katers.

In the ECG Notice, the signatory attorneys notified the Court that Encore Conversion Group, LLC "did not authorize Plaintiffs' counsel to file the [Motion] or the above-captioned lawsuit," that Plaintiffs' counsel recently appeared before Judge Mashburn in Adversary Proceeding No. 3:26-ap-90042, a case in which "[Plaintiffs' counsel's] client (WTA 25, LLC) *sued* one of the clients they allege to represent [in the above-captioned case before the Court], Encore Conversion Group, LLC," and (as relevant to the instant footnote) that attorney Grant Schmidt "has also been retained to represent [Plaintiff] Encore Luxury Coach Leasing, TN, Inc." (Doc. No. 60 at 1-2).

Thus, the docket before the Court suggests that Encore Conversion Group, LLC is both a plaintiff and a "nominal defendant," both supports and does not support the Motion, and is represented both: (a) in its capacity as a plaintiff by a group of attorneys comprised of R. Mark Donnell, Jr., Robert E. Barnes, and Christopher P. Katers; and (b) in its capacity as a plaintiff *and* its capacity as a "nominal" defendant by a group of attorneys comprised of Charles W. Cook, III, Daniel H. Puryear, and Grant Schmidt.

Fortunately, the Court's decision to deny the Motion requires no further opining on the party status or legal representation of Conversion Group, LLC., beyond noting this incoherence in hopes that the parties and their counsel will resolve this—ideally among themselves, without court intervention.

To the final point regarding attorney Grant Schmidt's purported representation of Plaintiff Encore Luxury Coach Leasing, TN, Inc., the Court notes the continued absence of a filing of a notice of appearance by Grant Schmidt on behalf of Plaintiff Encore Luxury Coach Leasing, TN, Inc.

the Court determines Plaintiffs' request for a preliminary injunction. (Doc. No. 55-5 at 1). In other words, Plaintiffs via the Motion effectively request the issuance of a TRO—namely, the Proposed TRO—to remain in effect until such time as the Court resolves Plaintiffs' request for a preliminary injunction.

BACKGROUND[2]

I.     Factual & Procedural Background[3]

This action, which was removed to this Court from the Davidson County Chancery Court based on federal-question jurisdiction, (Doc. No. 1), involves a dispute over the control and disposition of a company and its assets following its lender's declaration of default under particular loan documents, and it implicates various events leading up to the declaration of default and various events following the lender's assumption of control of the company and its assets. In their Complaint, Plaintiffs assert fifteen claims against Defendants,[4] including in relevant part a claim for breach of contract (Count I), a claim for breach of fiduciary duty (Count VI), a claim for fraudulent inducement (Count VIII), and a claim under the State of Tennessee's Uniform Commercial Code ("UCC") (Count XV). (Doc. No. 1-1 at 42, 64, 66, 75).

---

[2] These facts, unless identified as in dispute or otherwise qualified herein, are taken as true for purposes of the Motion, because they are either: (1) asserted and evidentially supported at least to some degree by one party and not rebutted by the other side; (2) otherwise not in genuine dispute; (3) asserted and evidentially supported by one side to such an extent, or in such a manner, that they are credited by this Court even if rebutted to some extent by the other side; or (4) subject to judicial notice.

[3] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page __ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document. In addition, where the Complaint or Memorandum is cited herein without including a paragraph symbol, the citation is not to a paragraph number but rather to a page that contains the cited content outside the boundaries of any paragraph.

[4] For the reasons detailed more fully below, the Court need not, for purposes of the Motion, analyze the majority of Plaintiffs' claims.

Given the multiplicity of interrelated entities named as Plaintiffs in this case, the Court generally will refer to The Ward Organization, LLC ("TWO") and its related Plaintiff entities[5] as the "Encore Business." The Encore Business operates in the "luxury entertainer motorcoach leasing industry," among other things, it transports "touring [musical] artists, their crews, and equipment between engagements." (Doc. No. 1-1 at ¶ 35). The Encore Business was founded in "August 2020 with twelve [luxury entertainer motor] coaches," and "from 2020 until November 2025, [Plaintiffs Justin Ward ("Ward") and Amanda Williams ("Williams")] worked to enable [the Encore Business] to design, build, lease, and maintain luxury entertainer coaches for touring professionals within the music industry." (*Id.* at ¶ 38).

In late 2022, the Encore Business identified Nitetrain Coach Company, Inc. ("Nitetrain") as a viable acquisition target. (Doc. No. 1-1 at ¶ 45). Nitetrain, along with its affiliate entities, were owned and controlled by Defendant Conner at the time. (*Id.* at ¶ 46). Pursuant to an "Equity and Asset Purchase Agreement" consummated on August 31, 2023 ("Nitetrain Acquisition") the Encore Business "acquired Nitetrain," as well as Nitetrain's managed fleet of "luxury entertainment coach[es]" (each a "Nitetrain Unit" and collectively "Nitetrain Fleet") and "the commercial real estate from which Nitetrain operated," (Doc. No. 55-1 at ¶ 12), at a price of "$100 million"[6] (the "Purchase Price"), (Doc. No. 55 at 4-5). With TWO as the "Borrower," (Doc. No. 57-4 at 2), Defendant Stonebriar (as lender) "funded the [Nitetrain] Acquisition pursuant to a Term Loan Agreement [the "Loan Agreement"] between Stonebriar, TWO, and Defendant Timothy

---

[5] As to which Plaintiffs are associated with the Encore Business and in what way(s) each such Plaintiff is associated with the Encore Business, the Court incorporates by reference the descriptive table in the Magistrate Judge's Order denying Plaintiffs' motion for appointment of receiver. (*See* Doc. No. 66 at 2-4).

[6] "[T]he total [Nitetrain] Acquisition purchase price [was] ($100 million)." (Doc. No. 55 at 5).

Conner."[7] (Doc. No. 55-1 at ¶ 12; Doc. No. 57-4). "Approximately $67 million of the total [$100 million Purchase Price] was attributed to [the Nitetrain Fleet]." (Doc. No. 55 at 4-5, Doc. No. 55-1 at ¶ 12). "TWO paid approximately $45 million [of the Purchase Price] through a series of Seller Notes[8] issued to [Defendant] Conner, including a $5 million holdback note, a $30 million note, and a $10 million note." (Doc. No. 55 at 5).

Due to the nature of the touring industry, the majority of the Nitetrain Units were actively in service during the diligence period leading up to the Nitetrain Acquisition and could not practicably be removed from service for inspection by the Encore Business prior to closing. (Doc. No. 1-1 at ¶ 50). The Encore Business was aware of this diligence hurdle and addressed it in two ways. First, Defendant Conner was required to make "numerous detailed representations and warranties"[9] as to the individual condition of each Nitetrain Unit along with the maintenance status of the Nitetrain Fleet. (*Id.* at ¶ 51). Second, "payment of $45 million of the [Purchase Price was deferred] for a period of time after closing [of the Nitetrain Acquisition]." (*Id.*).

---

[7] The Court notes that Defendants, not Plaintiffs, were the ones to file the Loan Agreement (Doc. No. 57-4).

[8] In the Motion, Plaintiffs do not further explain the nature, or the terms, of these "Seller Notes." The Court discerns, from the Loan Agreement, that the "Seller Notes" comprise "PROMISSORY NOTE A-2" in the amount of $5 million plus interest payable by October 1, 2028 (Doc. No. 57-4 at 34-36); "PROMISSORY NOTE B" in the amount of $30 million plus interest payable by March 25, 2029 (*id.* at 37-39); and "PROMISSORY NOTE C" in the amount of $10 million plus interest payable by October 1, 2028 (*id.* at 40-42).

[9] As is the case for many of the assertions offered by Plaintiffs, no corroborating documentation (for example, these "detailed representations and warranties") has been filed with the Motion.

In conjunction with the Loan Agreement, various Encore Business entities[10] executed a Guaranty and Security Agreement (Doc. No. 57-5, "Guaranty Agreement")[11] with Defendant Stonebriar and a "Junior Noteholder." Via the Guaranty Agreement, the various Encore Business entities "(i) guarant[ied] the Guarantied Obligations pursuant to the terms hereof, and (ii) grant[ed] . . . a continuing security interest in and to the Collateral specific to each such Grantor, as more particularly set forth in Section 3, in order to secure the prompt and complete payment, observance and performance of, among other things, the Secured Obligations." (*Id.* at 2). The Guaranty Agreement provides Defendant Stonebriar, upon certain defined "Events of Default," certain contractual remedies, including an irrevocable proxy and power of attorney in favor of Defendant Stonebriar allowing Defendant Stonebriar to exercise voting and governance rights in the various Encore Business entities[12] and to act as attorney-in-fact for each of them. (*Id.* at 25, §§ 11(a), (g); at 26, § 16(a)). The Guaranty Agreement further provides Defendant Stonebriar, in the event of "Events of Default," immediate possession, assembly, and disposition rights over certain collateral owned by the Encore Business. (*Id.* at 26, § 14; at 27, § 17(a)).

Following the Nitetrain Acquisition, the Encore Business discovered that at least seventeen of the Nitetrain Units were not in reasonably good operating condition and could not be placed into service without repair and maintenance work. (Doc. No. 1-1 at ¶ 66, Doc. No. 55 at 5). Fourteen of these seventeen aforementioned Nitetrain Units could not be placed into service at all,

---

[10] With the following as "Full Grantors": TWO; Encore Conversion Group, LLC; Encore Fleet Services, LLC; FleetCo20, LLC; Encore Luxury Coach Leasing, LLC; Encore Executive Fleet, LLC; Nitetrain Coach Company, Inc.; Luxury Coach Collision & Paint, Inc.; ADW2021, LLC; ADWEB2022, LLC; Dawnday, LLC; WEC23, LLC; TPMP, LLC; ACBI, LLC. (Doc. No 57-5 at 38-40). And with Justin Ward and Amanda Williams as "Limited Grantors." (Doc. No 57-5 at 41).

[11] Like the Loan Agreement, the Guaranty Agreement was filed solely by Defendants, not Plaintiffs.

[12] The "Pledged Companies." (Doc. No. 57-5 at 48-49, Schedule 5).

as they were beyond repair. (Doc. No. 1-1 at ¶ 66). An indeterminate number of the remaining 106 Nitetrain Units "suffered cascading mechanical failures," (Doc. No. 1-1 at ¶ 66), and required "extensive mechanical repair, overhaul, and even structural work" and associated "substantial [monetary] expenditures" before suitability for use in the Encore Business. (Doc. No. 55 at 5). Plaintiffs allege that these miscellaneous issues with the Nitetrain Fleet were "inconsistent with Conner's representations during the [Nitetrain] Acquisition process." (Doc. No. 55 at 5; Doc. No. 55-1 at ¶ 14; Doc. No. 55-4 at ¶ 18).

In a letter dated February 11, 2025, to Plaintiff Ward (Doc. No. 57-6 at 2, "Protective-Advance Agreement"), Harrison P. Smith (on behalf of Stonebriar) provided notice to TWO of Stonebriar's intent to issue a "Protective Advance" in the amount of $2.5 million on behalf of TWO (the "Borrower" under the Loan Agreement, Document No. 57-4 at 2) to satisfy TWO's "inability to meet certain of Borrower's payment obligations." (Doc. No. 57-6 at 2). In the Protective-Advance Agreement, Smith also stated that "certain Defaults or Events of Default [defined as the "Existing Defaults"] have occurred with respect to Borrower [TWO] under Section 7(a), 7(c) and 7(j) of the Loan Agreement," that TWO had "been properly noticed and has no defenses or counterclaims with respect to the Existing Defaults," and that TWO was "absolutely, irrevocably and unconditionally obligated to pay all Obligations[13] without any abatement or offset for any reason or under any circumstance whatsoever." (*Id.*). The Protective-Advance Agreement was "acknowledged and agreed [to]" by Plaintiff Ward on behalf of TWO. (*Id.*).

On March 12, 2025 at "Encore's headquarters in Tennessee," a meeting attended by "Defendants Conner, Wilkinson, Hirsch, and Carter as well as [non-party] Daniel Lewis" was held

---

[13] The Court observes that the term "Obligations," as its capitalization suggests, does have a defined meaning; although undefined in the Protective-Advance Agreement, it is defined in the Loan Agreement. (*Compare* Doc. No. 57-6 at 2, *with* Doc. No. 57-4 at 5, § 1(xx)).

"ostensibly to address the cancellation of the Seller Notes arising from Conner's misrepresentations [regarding the soundness of the Nitetrain Fleet]. (Doc. No. 55 at 5-6; Doc. No. 55-1 at ¶ 15). At or around the aforementioned March 12, 2025 meeting, Defendant Stonebriar "instructed TWO and Ward to cease all contact with Conner and represented that it would conduct all negotiations [as to TWO's indemnification claims against Carter] on TWO's behalf," and that "Hirsch separately told Ward that Stonebriar was working toward a resolution of TWO's claims against Conner and asked Ward to be patient, tying any forbearance agreement to that resolution. (Doc. No. 55 at 5-6; Doc. No. 55-1 at ¶ 15).

On March 26, 2025, an agreement (Doc. No. 57-7 at 2-10, "Forbearance Agreement")[14] was executed by[15] Defendant Wilkinson behalf of Defendant Stonebriar and by Plaintiffs Ward and Williams on behalf of TWO, as "Borrower," as well as on behalf of various other Encore Business entities.[16] Among other things, the Forbearance Agreement memorialized: (1) defaults and/or events of default by the Encore Business prior to December 1, 2024 (*id.* at 2), (2) an outstanding liability of the "Loan Parties"[17] to Defendant Stonebriar of $152,856,457.09[18] as of

---

[14] Like various other documents, the Forbearance Agreement was filed solely by Defendants, not Plaintiffs.

[15] Although Defendant Conner is listed on the signature page along with a signature line whereby he "acknowledged and agreed" to the Forbearance Agreement, Defendant Conner's signature does not appear on the Forbearance Agreement filed with the Court. (Doc. No. 57-7 at 10).

[16] Encore Conversion Group, LLC; Encore Fleet Services, LLC; FleetCo20, LLC; Encore Executive Fleet, LLC; RD Ventures, LLC; Get On, LLC; Linzimatt Transit, LLC; TJC, LLC; AWMF, LLC; Sable Logistics, LLC; TCH Enterprises, LLC; WEC23, LLC; TPMP, LLC; ACBI, LLC; Encore Luxury Coach Leasing, LLC; Nitetrain Coach Company, Inc.; Luxury Coach Collision & Paint, Inc.; ADW2021, LLC; ADWEB2022, LLC; Dawnday, LLC. (Doc. No 57-7 at 10).

[17] The Court observes that the term "Loan Party," as its capitalization suggests, does have a defined meaning; although undefined in the Forbearance Agreement, it is defined in the Loan Agreement. (*Compare* Doc. No. 57-7, *with* Doc. No. 57-4 at 4, § 1(nn)).

[18] This amount comprising "an outstanding principal balance of $146,709,829.62 and interest at the contractual, non-default rate of $6,147,084.56." (Doc. No. 57-7 at 2, § 2(a)). As to the near-$50 million gulf between (i) the principal balance acknowledged in the Forbearance Agreement and (ii) the "total

March 25, 2025 (*Id.* at 2, § 2(a)) as well as defined "Additional Obligations" of the Loan Parties (*Id.* at 2, § 2(b)-(d)), and (3) Defendant Stonebriar's agreement to refrain from exercising any of its rights under the Loan Agreement and/or the Guaranty Agreement until May 31, 2025, at the latest *unless* Stonebriar notified the Borrower in writing of a different date (*Id.* at 5-6, § 9). The Forbearance Agreement also memorialized the agreement that "no Loan Party has any defenses, counterclaims, or rights of setoff with respect to the Existing Events of Default or any of the Obligations or otherwise owed or owing to Agent or any Lender." (*Id.* at 4, § 6(d)). And the Forbearance Agreement likewise memorialized the agreement that "on or before May 1, 2025, Borrower [TWO] shall have received a new cash equity contribution of at least $1,785,000.00, in the aggregate, from Justin Ward and Amanda Williams." (Doc. No. 57-7 at 3, § 5(d)).

Plaintiffs allege that "over the preceding year [to November 6, 2025]," Defendant Stonebriar "repeatedly represent[ed]" that "it would cooperate with [Encore Business] management to restructure the [Loan Agreement's] debt following the [below-referenced] $40 million reduction of Conner's Seller Notes [and execution of the associated settlement agreement effectuating the same]." (Doc. No. 55 at 8; Doc. No. 55-1 at ¶ 21). Plaintiffs assert that on July 3, 2025, a settlement agreement (the "Settlement Agreement")[19] was executed in which TWO, in exchange for a reduction of the Sellers Notes from around $45 million down to $5 million,

---

[Nitetrain] Acquisition purchase price [of] ($100 million)" (Doc. No. 55 at 5), the Court discerns that the Loan Agreement states that the "term loan [pursuant thereto was] in an aggregate principal amount not to exceed [$129.5 million]" (Doc. No. 57-4 at 2). The Court does not discern, and will not speculate as to, how the Loan Agreement's "[$129.5 million] aggregate principal amount" (*id.*) grew to the "[approximately $146.7 million] outstanding principal balance" (Doc. No. 57-7 at 2, § 2(a)) memorialized in the Forbearance Agreement.

[19] Plaintiffs have not filed a copy of the alleged Settlement Agreement or otherwise taken steps to demonstrate the existence of, parties to, or the terms of the alleged Settlement Agreement, other than submitting declarations that make averments about the alleged Settlement Agreement.

"waive[d] all indemnification claims against [Defendant] Conner while releasing [Defendant] Conner from liability." (Doc. No. 55 at 6).

On September 3, 2025, Plaintiff Ward sent an email to Defendant Stonebriar, via Stonebriar employees (and Defendants) Blaine Hirsch and Jeffrey Wilkinson, stating "Blaine / Jeff Just a follow up to our call . . . . Come hell or high-water we will restart interest payments October 1. It is an absolute priority for us and we are adjusting all operations as required accordingly." (Doc. No. 57-8 at 2). On November 6, 2025, executive employees[20] of Defendant Stonebriar met with Plaintiff Ward and presented him with a "Pledge Exercise Notice" (Doc. No. 57-9 at 2-44), which gave notice of Stonebriar's exercise of, among other powers in the Guaranty Agreement, proxy and powers of attorney as to the various Encore Business entities. (Doc. No. 55 at 7-8). The stated grounds for Stonebriar's exercise of those powers "include[d], without limitation . . . Events of Default under Sections 7(a), 7(c), 7(j) and 7(l) of the Loan Agreement; and . . . breach of the Borrower's obligations under the Forbearance Agreement, dated as of March 26, 2025, between the Borrower and [Stonebriar], including but not limited to, the payment of $1,785,000 due on May 1, 2025, pursuant to Section 5(d) thereof." (Doc. No. 57-9 at 6).

Since November 6, 2025, Defendant Stonebriar has conducted the operations of the Encore Business, has removed Plaintiffs Ward and Williams from the operations of the Encore Business, has hired Defendant Carter to serve as "Interim Chief Executive Officer" of the Encore Business, and has hired Defendant Conner "to oversee and support daily operations." (Doc. No. 55 at 8-9, Doc. No. 55-4 at ¶ 44).[21]

---

[20] The employees were Defendants Blaine Hirch ("Hirch") and Jeffrey Wilkinson ("Wilkinson"), as well as non-party Daniel Lewis ("Lewis").

[21] The Court here will briefly explain why it has excluded reference to certain factual allegations, some made by Plaintiffs and some made by Defendants, in this factual background and in the Court's subsequent analysis of pertinent claims of Plaintiffs for purposes of the Motion.

On April 24, 2026, Defendant Stonebriar issued a document it styled (in the document's page header) as "Notice of Events of Default, Acceleration and the Exercise of Other Remedies, including, *inter alia*, Commencement of Public Foreclosure Sale (Doc. No. 55-2 at 2-34, "Sale Notice"). The Sale Notice announced an auction pursuant to Sections 9-610 and 9-613 of New York's Uniform Commercial Code (the "Sale")—to be held on Thursday, May 28, 2026—of certain Encore Business assets (the "Auction Collateral") detailed on Schedule II to the Sale Notice and pledged to secure the obligations detailed in the Loan Agreement and related documents. (Doc. No. 55-2). The Auction Collateral comprises 144 "buses and coaches" (the "Motorcoaches," Doc No. 55-1 at ¶ 9; Doc. No. 55-2 at 15-24), 55 "cargo trailers manufactured by TAT, Inc." (Doc. No. 55-2 at 24-25), 17 "motor vehicles" (*Id.* at 25), and various other interests in the Encore Business entities (*Id.* at 25-26, §§ D-G). The Encore Business derives virtually all of its revenue from the Motorcoaches and associated leasing contracts. (Doc. No. 55-1 at ¶ 9; Doc. No. 55-4 at 11, ¶ 70).

---

The Court discerns that in their respective filings, each side makes much of the other side's actions with respect to the operation, maintenance, and oversight of the Encore Business. Plaintiffs contend that Defendants have run the Encore Business into the ground, destroyed the value thereof, terminated and/or diverted leases to competitors, and so on. (*See, e.g.*, Doc. No. 55 at 7-10). Defendants similarly contend that Plaintiffs mismanaged the Encore Business, which led to the events of default by Plaintiffs under the Loan Agreement and the Forbearance Agreement and to the November 6, 2025 Pledge Exercise Notice and associated change of control of the Encore Business. (*See, e.g.,* Doc. No. 57 at 4-6). Defendants further contend that Plaintiffs' actions, such as the purported "storming" of the Encore headquarters and statements made to various Encore Business-related third-parties such as insurers, business affiliates, and others, diminished the value of the Encore Business and represents the true cause of the issues facing the Encore Business following the November 6, 2025 Pledge Exercise Note and associated change in operational control of the Encore Business. (*See, e.g., id.* at 7-9).

But the Court emphasizes that neither side has tied its allegations regarding the other side's Encore Business-harming behavior to the relief sought in the Motion, i.e., *postponing the Sale of the Motorcoaches* and other Encore Business assets noticed for sale. That is to say, Plaintiffs have not requested this Court issue a TRO restoring control of the Encore Business to, for example, Plaintiffs Ward or Williams. Nor have Plaintiffs have requested this Court issue a TRO restraining Defendants from taking specific actions, other than the Sale, in the course of conducting or directing the Encore Business.

To put it plainly, the relief sought by Plaintiffs in their Proposed TRO and filings in support narrows the scope of the Court's inquiry to issues concerning the Sale and particularly the sale of the Motorcoaches.

## II.     Relief Sought via the Motion & Accompanying Filings

Via the Motion, Plaintiffs request pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65.01 two kinds of temporary equitable relief—a TRO and a preliminary injunction—potentially to be issued in sequence. More specifically, Plaintiffs request via the Motion that the Court first enter the Proposed TRO, which would "enjoin[ ] and restrain[ ]" Defendants and "any agents acting on their behalf" from "selling, auctioning or disbursing any of the Plaintiffs' assets[22] including the 144 motorcoaches and real estate in White [sic] Creek, TN," and would remain in effect until the Court determines Plaintiffs' request for a preliminary injunction. (Doc. No. 55-5 at 1).

Accompanying the Motion are the Ward Declaration (Doc. No. 55-1), which is accompanied by two exhibits (Doc. Nos. 55-2 – 55-3); the Weatherspoon Declaration (Doc. No. 55-4); and the Proposed TRO (Doc. No. 55-5).

## LEGAL STANDARD

## I.     Temporary Restraining Order & Preliminary Injunction

A "TRO is an extraordinary and drastic remedy . . . ." *Ahrouch v. Boulakhrif*, No. 2:25-CV-02535-SHL-CGC, 2025 WL 1490494, at *2 (W.D. Tenn. May 23, 2025) (quoting *Proctor & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996)). Those seeking a TRO (or, for

---

[22] The Court notes that in requesting this relief, Plaintiffs presume that the assets stated in fact belong to Plaintiffs, rather than belonging to Defendants pursuant to the exercise of powers under the Guaranty Agreement.

that matter, a preliminary injunction)[23] must meet four requirements.[24] They must show a

likelihood of success on the merits; irreparable harm in the absence of the injunction; the balance

---

[23] The standards for evaluating a request for a TRO and a request for a preliminary injunction are the same. *G.S. ex rel. Schwaigert v. Lee*, 558 F. Supp. 3d 601, 607 (W.D. Tenn. 2021). Thus, in addressing Plaintiffs' request for a TRO, the Court will, at times, utilize case law that addresses requests for preliminary injunctions rather than requests for TROs.

[24] Published Sixth Circuit case law stands unmistakably for the proposition that these four items are factors rather than requirements, except that irreparable harm is a requirement (and, if it exists and thus keeps the possibility of a TRO alive, thereafter becomes a factor to be balanced along with the other three factors). *See, e.g., D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326-27 (6th Cir. 2019). Alas, this case law is inconsistent with other (including more recent) Sixth Circuit case law and with Supreme Court cases (including *Winter*) that describe these as all being requirements (i.e., things that *must* be established. *See, e.g., id.* at 328, 329 (Nalbandian, J., concurring) (noting that "[*Winter*]'s language seems clear—a plaintiff *must* establish the factors" and questioning "whether the balancing analysis itself aligns with *Winter.*").

Notably, other courts have likewise treated the four items as requirements (prerequisites), rather than as factors. *E.g., Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003); *Southern Poverty Law Ctr. v. United States Dep't Homeland Sec.*, Civil Action No. 18-760 (CKK), 2020 WL 3265533, *10 (D.D.C. June 17, 2020); *Transatlantic, LLC v. Humana, Inc.*, 8:13–CV– 1925–T–17TBM, 2013 WL 3958361, *1 (M.D. Fla. Aug. 1, 2013).

The Court believes that it needs to choose between the two approaches—even if the substance or the outcome of the Motion does not turn on such choice—because the approach does dictate how a court goes about explaining its analysis and decision on a motion for a TRO. And the Court believes that it should follow the latter line of cases, i.e., those that treat the standard as involving requirements rather than factors.

First, explaining and applying the standard in terms of requirements is substantially more straightforward than the alternative—which is to explain that the four items are factors to be balanced, except that, well, that's only partially true because actually irreparable harm *is* a requirement (but also, if it exists, *then* a factor to be balanced along with the other factors) and likelihood of success (at least to some minimal extent) is also required. *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326-27 (6th Cir. 2019) ("Thus, although the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory."); *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (noting that it is reversible error for a district court to issue a preliminary injunction "where there is simply no likelihood of success on the merits (quoting *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010))).

Second, it is easier to articulate a conclusion as to whether requirements are satisfied (which is done in simple yes/no, or satisfied/unsatisfied, terms) than to articulate the outcome of some so-called "balancing" of (mismatched) factors. This is especially true given that case-specific balancing apparently is based in part on some inscrutable sliding scale of required likelihood of success on the merits that depends on the strength of the other three factors. *See, e.g., In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985) ("[T]he degree of likelihood of success required may depend on the strength of the other factors.").

The Court notes that herein it quotes some case law that refers to these items as "factors" and describes them in language that befits factors more than requirements—as for example by referring to the i*ssue* of *whether* issuing the injunction would harm others (factor-style language) rather than the *requirement* that the balance of equities favors the movant, or the issue of where the public interest lies (factor-style language) rather than the requirement that the public interest favors an injunction. In so doing, the Court is confident that the astute reader readily will be able to translate the factor-style language into the corresponding language of requirements for purposes of following the Court's analysis herein. The Court

of equities favors them; and that the public interest favors an injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Sisters for Life, Inc. v. Louisville-Jefferson County*, 56 F.4th 400, 403 (6th Cir. 2022). Further, the injunctive relief sought must be tied to the claims asserted in the case. "[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint." *Colvin v. Caruso*, 605 F.3d 282, 300 (6th Cir. 2010) (alteration in original) (quoting *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994)). Plaintiffs seeking a TRO may not merely rely on unsupported allegations but rather must come forward with more than "scant evidence" to substantiate their allegations.[25] *See, e.g.*, *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 417 (6th Cir. 2014); *Cameron v. Bouchard*, 815 F. App'x 978, 986 (6th Cir. 2020) (vacating preliminary injunction when plaintiffs made no evidentiary showing on some elements of their claim, but instead made mere allegations regarding the treatment of COVID-19 in prisons); *McNeilly v. Land*, 684 F.3d 611, 614 (6th Cir. 2012) (upholding denial of preliminary injunction when plaintiff made only a "small showing" of evidence); *United States v. Certain Land Situated in City of Detroit*, No. 95-1118, 1996 WL 26915, *1 n.1 (6th Cir. Jan. 23, 1996) (noting a lack of evidence to support speculative allegations); *Boulding v. Corr. Med. Servs.*, No. 1:06-CV-811, 2008 WL 2095390, at *1 (W.D. Mich. Feb. 11, 2008), *report and recommendation adopted*, No. 1:06-CV-811, 2008 WL 2095387 (W.D. Mich. May 15, 2008) ("Plaintiff did not marshal any evidence in support of his motion [for a preliminary injunction]. Plaintiff's unsupported allegations do not suffice.")

---

also notes that even in some opinions where the court clearly treats the four items as requirements, the court therein at times refers to them as "factors." *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 677 (N.D. Tex. 2016).

[25] When courts refer to this principle, usually it is in connection with a motion for a preliminary injunction rather than a motion for a TRO. But it has been referred to also in connection with a motion for a TRO, *e.g., Dates v. HSBC*, 721 F. Supp. 3d 616, 624 (S.D. Ohio 2024), and the Court believes that it applies to a motion for a TRO just as it applies to a motion for a preliminary injunction.

(citations omitted). In conducting the TRO analysis, the Court is not limited to the four corners of the complaint but rather may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding. *Express Franchise Servs., L.P. v. Impact Outsourcing Sols., Inc.*, 244 F. Supp. 3d 1368, 1379 (N.D. Ga. 2017); *Action NC v. Strach*, 216 F. Supp. 3d 597, 629 (M.D.N.C. 2016) (explaining that district courts in appropriate circumstances rely on hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted).

In its analysis, it is not the Court's job "to root through the record not unlike a pig in search of truffles to uncover any grain of evidence that might support the position of a party that chose to otherwise sit on its hands." *Penn-Daniels, LLC v. Daniels*, No. 07-1282, 2010 WL 431888, at *3 (C.D. Ill. Jan. 28, 2010) (citing *Casna v. City of Loves Park*, 574 F.3d 420, 424 (7th Cir. 2009)). *Accord Emerson v. Norvartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (noting that "judges are not like pigs, hunting for truffles" that might be buried in the record). The Court is not under any obligation to develop, flesh out, or formulate arguments on Plaintiffs' behalf. *See Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006) ("[W]e decline to formulate arguments on [appellant's] behalf"). Arguments which are perfunctory, conclusory, undeveloped, or devoid of legal authority can even be deemed waived. *See Moore v. Comm'r of Soc. Sec.*, 573 F. App'x 540, 543 (6th Cir. 2014) (citing *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010)) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."); *United States v. Sandridge,* 385 F.3d 1032, 1035 (6th Cir. 2004) ("Issues adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived.") (internal quotation marks omitted).

II.     Applicable Claims

Because this action was removed to this Court based on federal question jurisdiction, (Doc. No. 1), the Court exercises supplemental jurisdiction over Plaintiffs' related state-law claims under 28 U.S.C. § 1367(a), and Tennessee substantive law governs each of those claims. *Osborn v. Griffin*, 865 F.3d 417, 433 (6th Cir. 2017); *Evans v. Walgreen Co.*, 813 F. Supp. 2d 897, 913-14 (W.D. Tenn. 2011).

In connection with the Motion, the Court considers only some of Plaintiffs' claims. In the Motion, Plaintiffs state that "[s]uccess under Counts I - Breach of Contract, IV - Breach of Fiduciary Duty, and VIII - Fraudulent Inducement are particularly clear as detailed below." (Doc. No. 55 at 13).[26] Although "Counts XIV & XV (UCC Claims)" (*id.* at 19) are not included in Plaintiffs' list of claims for which "[s]uccess . . . [is] particularly clear," (*id.* at 13), the Court discerns that Plaintiffs offer legal argument and analysis in support of a UCC claim, specifically a UCC claim pursuant to Tennessee law, in their Motion. (*See id.* at 19-20). Accordingly, the Court herein will analyze Plaintiffs' Count XV (a UCC claim under Tennessee law) but not Count XIV (a UCC claim under New York law).

Plaintiffs then purport to "incorporate[ ] by reference" their "Response to Stonebriar's Motion to Dismiss (D. 38)" to "provide[ ] the basis for likely success on the merits" for other of

---

[26] The Court notes that Plaintiffs' *fourth* claim in the Complaint is a claim under 18 U.S.C. 1962(b), part of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). (Doc. No. 1-1 at 60). Plaintiffs' *sixth* claim alleged in the complaint is titled, "Action for Breach of Fiduciary Duty." (Doc. No. 1-1 at 64). As Plaintiffs provide an analysis in their Motion as to why they are "likely to succeed on their Breach of Fiduciary Duty Claim," (*see* Doc. No. 55 at 16-19), the Court will assume Plaintiffs' reference to "IV," (Doc. No 55 at 13), was in error and ought instead to have been to VI, as Plaintiffs' Count VI alleges breaches of fiduciary duty by certain Defendants. (Doc. No. 1-1 at 64).

Plaintiffs' claims in the Complaint. (Doc. No. 55 at 13, n.6). As a preliminary point, the Court notes that the purportedly incorporated document, being Plaintiffs' response to a motion pursuant to Federal Rule of Civil Procedure 12(b)(6), presents limited utility to anyone in the context of the instant Motion for a TRO and preliminary injunction pursuant to Federal Rule of Civil Procedure 65. Regardless, Plaintiffs do not provide a basis for their having the prerogative to do so,[27] and they acknowledge in their Reply that they briefed and asserted (at most) only four claims

---

[27] The Court expressly instructed Plaintiffs that if they "desire[d] that this Court enter a temporary restraining order," then they should ensure that such relief is requested "in compliance with all applicable rules, including but not limited to *the Local Rules of the Court*." (Doc. No. 54, emphasis added).

Local Rule 7.01(a)(2) imposes an aggregate twenty-five-page limit on motions and/or memorandums in support thereof, unless leave to exceed such limit is affirmatively granted by the Court. *See* LR 7.01(a)(2). The Motion is twenty-seven pages—at which the Court does not take offense, given Local Rule 7.03's exclusion of case caption, signature line(s), and certificate of service from the twenty-five-page limit mandated in Local Rule 7.01(a)(2). *See* LR 7.03(a). The Court does question whether Plaintiffs properly complied with the minimum font size for footnotes, *see* LR 7.03(a), but declines to delve further into that question.

But Plaintiffs, via the purported "incorporat[ion] by reference" of their "Response to Stonebriar's Motion to Dismiss (D. 38)," (Doc. No. 55 at 13, n.6), would seem to present the Court with *another*, approximately, twenty-six pages in addition to the Motion's twenty-seven pages. (*See* Doc. No. 38; Doc. No. 55). So the Court must either construe the Motion as (i) *including* Document No. 38 and presenting approximately fifty-three pages for the Court's consideration *without* leave (indeed, without even a *request* for such leave) to greatly exceed the clear page limitation expressed in Local Rule 7.01(a)(2) and re-emphasized by reference in the Court's Order (Doc. No. 54), or (ii) merely *referring to* legal analysis made for purposes of other requested relief without *asserting* such analysis is properly before the Court in support of the Motion. To avoid attributing to Plaintiffs an end run around the Court's Order and the Local Rules, the Court will elect the latter construal, eschew consideration of Document No. 38, and analyze only the arguments briefed in the Motion itself.

presenting a likelihood of success on the merits for purposes of the Motion.[28] Accordingly, the

Court will not assess or opine on Plaintiffs' likelihood of success on their other claims.[29]

ANALYSIS

As noted above, a party seeking a TRO (or a preliminary injunction) must show: (1)

whether the movant has demonstrated a likelihood of success on the merits; (2) whether the movant

will suffer irreparable harm in the absence of relief; (3) whether the balance of equities favors the

movant; and (4) whether the injunction would serve the public interest. *Winter*, 555 U.S. at 20.

I.      Likelihood of Success on the Merits

The Court will assess whether Plaintiffs have shown a likelihood of success on the merits

as to Plaintiffs' above-specific four claims, namely those for breach of contract, breach of fiduciary

duty, fraudulent inducement, and under the UCC.

---

[28] "Plaintiffs have met all factors for their [Tennessee] UCC, breach of contract, fiduciary duty, and fraudulent inducement claims and are likely to succeed on the merits." (Doc. No. 58 at 7).

At this point, the Court will make a specific admonition given the very next sentence of the Reply where Plaintiffs cite the undersigned's decision in *Ever-Seal Inc., v. Halferty*, No. 3:22-cv-00082, 2022 WL 418692, at *6 (M.D. Tenn. Feb. 10, 2022), for the proposition that "with all elements of both a breach of contract and breach of fiduciary claim met, the Court held [in *Ever-Seal* that] the [plaintiff had strong [sic] likelihood of success on the merits in granting a temporary restraining order." (Doc. No. 58 at 5-6). But *Ever-Seal* did not hold this, as indicated by the following from *Ever-Seal*

> "Plaintiff states: 'In addition to asserting claims for breach of contract and intentional interference, Ever-Seal also brings a claim for breach of fiduciary duty. Although Ever-Seal is confident it will prevail on all claims at trial, the focus of this motion is on the breach of contract and intentional interference claims.' *Plaintiff thus does not present any argument* as to why and whether it has a strong likelihood of success *on its breach of fiduciary duty claim. The Court likewise will not address this claim*, and so doing is unnecessary in any event because the Court finds that Plaintiff has established a strong likelihood of success on its other two claims."

*Ever-Seal*, 2022 WL 418692, at *6 (cleaned up) (emphasis added). Although Plaintiffs' misrepresentation of *Ever-Seal* is not material under the applicable circumstances, Plaintiffs would do well to take greater care when paraphrasing the opinions that they cite.

[29] Nor will the Court assess Plaintiffs' likelihood of success on claim VII based on Plaintiffs' conclusory assertion that "the facts stated directly above [in Section IV.A.1] support Plaintiffs' likelihood of success on the merits of Count VII (Action for Breach of Common Law and Statutory Duties to Preserve Collateral)." (Doc. No. 55 at 16).

### a. Breach of Contract

The Court discerns that the parties disagree as to the law properly applicable to Plaintiffs' breach of contract claim. In their Motion, Plaintiffs generally cite Tennessee law, though without providing any support for the application of Tennessee law to Plaintiffs' breach of contract claim. (Doc. No. 55 at 14-16). In their Response, Defendants cite New York law and support the applicability of New York law by reference to the choice-of-law provisions in both the Loan Agreement and the Guaranty Agreement. (Doc. No. 57 at 13, n.12; Doc. No. 57-4 at 17; Doc. No. 57-5 at 30). In their Reply, Plaintiffs neither rebut Defendants' arguments as to the applicability of New York law to Plaintiffs' breach of contract claim nor support Plaintiffs' conflicting position that Tennessee law is applicable to Plaintiffs' breach of contract claim. (*See generally* Doc. No. 58). The Court notes that in Plaintiffs' Complaint, Plaintiffs affirmatively assert that New York law applies to the Loan Agreement.[30] However, even assuming *arguendo*[31] that Tennessee law governs Plaintiffs' breach of contract claim, for the following reasons Plaintiffs fail to show a likelihood of success as to Plaintiffs' breach of contract claim.

Under Tennessee law, the "essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*,

---

[30] "New York law applies to the interpretation of the Stonebriar-TWO 'Term Loan Agreement' pursuant to the 'Governing Law' provision 9(f)." (Doc. No. 1-1 at ¶ 290).

[31] The Court analyzes Plaintiffs' claim under only Tennessee law, both here and subsequently herein, for the reason that *if* Plaintiffs have failed to brief New York law in articulating Plaintiffs' claim (for, e.g., breach of contract), *and* New York law is applicable to Plaintiffs' claim(s), *then* Plaintiffs cannot show a likelihood of success on the merits as to a claim where Plaintiffs fail *ab initio* to set out the correct legal standard and supporting caselaw.

Given the Court's conclusion that Plaintiffs fail to show a likelihood of success on the merits as to the claims asserted under the law (Tennessee state law) that Plaintiffs purport to be applicable to such claims, the Court need not reach the question of what law in fact applies to each such claim.

183 S.W.3d 1, 26 (Tenn. Ct. App. 2005). As a preliminary matter, the Court reiterates that Plaintiffs failed to provide the Court with the very contractual documents—namely, the Loan Agreement, the Guaranty Agreement, and/or the Forbearance Agreement—that Defendants allegedly breached. To the extent that Plaintiffs attempt to show "the existence of a contract"—something that is not only an element in its own right but also an obvious prerequisite to the existence of the other two elements—Plaintiffs do so merely by reference to conclusory allegations in their Complaint—specifically, paragraphs 164, 166-170, and 171. (*See* Doc. No. 55 at 14)[32]. This potentially could have been fatal on the Motion to the extent it is based on this claim because Plaintiffs cannot rely on mere allegations to establish a likelihood of success on the merits; However, the Court will proceed with its analysis as Defendants have filed the relevant contractual

---

[32] Quoted verbatim, these paragraphs provide, respectively:

¶ 164. Pursuant to the Loan Agreement and section 16(a) of the Guaranty Agreement, in the event of a default under the Loan Agreement by TWO, TWO, Guarantors, Ward and Williams have purportedly pledged their ownership interests and granted Stonebriar their proxy and power of attorney to exercise the rights in the entities defined by the Guaranty Agreement as "Grantors."

¶ 166. TWO was not in default under the Loan Agreement because Stonebriar had materially modified the Loan Agreement by unequivocally directing TWO and Encore to invest all available earnings—and Ward and Williams to invest additional personal equity infusions—into restoring the Nitetrain Fleet rather than make payments due under the Loan Agreement.

¶ 167. Stonebriar's direction constitutes a material modification of the Loan Agreement and Forbearance Agreement because Stonebriar knew that by directing TWO, Encore, Ward and Williams to invest all available earnings into repairing the Nitetrain Fleet rather than debt service, TWO would be unable to make debt service payments. Stonebriar acquiesced in the same.

¶ 168. By October 1, 2025, as a direct result of following Stonebriar's direction, TWO and Encore's finances were stabilizing and TWO was on a trajectory to resume debt service in 2026, with an equity "cushion" of tens of millions of dollars.

¶ 169. Despite Stonebriar's knowledge that it had directed TWO to forgo debt service in favor of fleet repairs and that TWO and Encore had stabilized and were positioned to resume debt service in 2026 as Stonebriar had agreed, Stonebriar wrongfully declared TWO in default under the Loan Agreement and purported to exercise control rights under the Guaranty Agreement.

¶ 170. Stonebriar materially breached the Loan Agreement and Guaranty Agreement by purporting to exercise its rights as pledgee, proxy, and attorney-in-fact over TWO and Encore Tennessee in the absence of a valid default by TWO.

¶ 171. Stonebriar materially breached the Guaranty Agreement by failing to exercise its alleged discretion consistent with its contractual duty to do so within it [sic] "Permitted Discretion," which is defined in the Guaranty Agreement as "a determination made in good faith and in the exercise of reasonable business judgment (from the perspective of a senior secured, asset-based lender)."

documents—namely, the Loan Agreement, the Guaranty Agreement, and/or the Forbearance Agreement—with the Court. (Doc. No. 57-4, Doc. No. 57-5, Doc. No. 57-7).

The Court discerns that Plaintiffs assert that Defendants breached the applicable contracts in the following ways. First, Defendant Stonebriar allegedly breached the Loan Agreement by prematurely exercising the guarantors' proxy and power of attorney powers in the absence of a default permitting Defendant Stonebriar to exercise such powers. (Doc. No. 55 at 14). Second, Defendant Stonebriar allegedly breached the Guaranty Agreement by "exercis[ing] its alleged discretion" inconsistent with the contractually defined "Permitted Discretion" standard. (*Id.*). Third, Defendant Stonebriar allegedly breached the Guaranty Agreement by "intentionally, recklessly, or negligently failing to preserve the assets and value of [the Encore Business], and by failing to act in good faith, while exercising any alleged discretion it claims it has in a bad faith manner," because "[w]hen a secured creditor exercises control over collateral, it must act in a commercially reasonable manner. T. C. A. § 47-9-610(b)." (*Id.* at 15). Fourth, Defendant Stonebriar intends to "sell the entire fleet of [Motorcoaches]." (*Id.* at 16). Fifth, allegedly, "Stonebriar and their co-conspirators systematically breached their contractual duty[33] of good faith and fair dealing by diverting all leasing business away from Encore to assure that the [M]otorcoaches were free of contractual leases so that Stonebriar could attempt to seize them at a commercially unreasonable UCC sale." (*Id.* at 15).

The Court discerns that the third alleged breach is, at best, no more than a restatement of Plaintiffs' claim for breach of fiduciary duty and/or Plaintiffs' claim under the UCC, and the fourth alleged breach is, at best, no more than a restatement of Plaintiffs' claim under the Tennessee UCC. Accordingly, the Court will analyze the third and fourth alleged breaches not here, but rather

---

[33] Plaintiffs do not specify whether this duty arises under the Loan Agreement or, instead, under the Guaranty Agreement.

subsequently in the Court's respective analyses herein of Plaintiffs' claim for breach of fiduciary duty and claim under the Tennessee UCC.

### i. Plaintiffs have not established the likely absence of a default under the Loan Agreement.

As to the first alleged breach, Plaintiffs contend Defendant "Stonebriar has wrongfully exercised these rights [as to the Guaranty Agreement's "Full Grantor" entities] in the absence of a valid default." (Doc. No. 55 at 14). But in the Court's view, the Protective-Advance Agreement, the Forbearance Agreement,[34] and the September 3, 2025 email from Plaintiff Ward[35] all point to the opposite—that Plaintiffs were, and continued to be, in default under the Loan Agreement and under the Forbearance Agreement up to the time of the Pledge Exercise Notice; at the very least, the Court can conclude that Plaintiff has not shown that the facts likely are otherwise.[36] And

---

[34] This document was signed by Justin Ward on behalf of certain Encore Business entities and by Amanda Williams on behalf of certain other Encore Business entities. (Doc. No. 57-7 at 10). It memorialized defaults and/or events of default by the Encore Business prior to December 1, 2024 (*Id.* at 2), an outstanding liability to Defendant Stonebriar of $152,856,457.09 as of March 25, 2025, plus additional obligations (*Id.* at 2-3, §§ 2(a)-(d)), Defendant Stonebriar's agreement to refrain from exercising any of its rights under the Loan Agreement or the Guaranty Agreement until May 31, 2025, at the latest *unless* Stonebriar notified the Encore Business in writing, (*Id.* at 5-6, § 9), and that "no Loan Party has any defenses, counterclaims, or rights of setoff with respect to the Existing Events of Default or any of the Obligations or otherwise owed or owing to Agent or any Lender," (*Id.* at 4, § 6(d)).

[35] ". . . Come hell or high-water we will restart interest payments October 1. It is an absolute priority for us and we are adjusting all operations as required accordingly." (Doc. No. 57-8 at 2).

[36] A recurrent assertion in Plaintiffs' filings related to the Motion, as well as in Plaintiffs' other filings, is that "TWO [e]xpected to resume debt payment servicing in 2026 consistent with the parties' prior understanding." (Doc. No. 55 at 7, *see also* Doc. No. 55-1 at ¶ 18).

In support thereof, Plaintiffs offer nothing more than recursive, conclusory citations. Citations are made, for example, to the Ward Declaration (". . . I provided Stonebriar with a detailed operational and financial report reflecting these improvements and demonstrating that TWO expected to resume debt service payments in 2026 consistent with the parties' prior understanding," Doc. No. 55-1 at ¶ 18), as well as to the Weatherspoon Declaration (stating that "discussions regarding a second forbearance agreement had already stalled in late July and early August 2025," Doc. No. 55-4 at ¶ 35)

However, the paragraph (no. 35) of the Weatherspoon Declaration on which Plaintiffs rely contains nothing that even remotely supports the assertion for which Plaintiffs cite it. The same is likewise true as to the paragraph (no. 18) of the Ward Declaration on which Plaintiff's rely; that paragraph offers no detail, clarity, or substantiation as to the purported understanding that TWO's debt payment servicing would resume in 2026. Accordingly, the Court finds this alleged understanding that the Encore Business (namely,

further, each of these three documents is signed—or, in the case of the September 3, 2025 email from Justin Ward, authored—by one or more representative(s) of Plaintiffs. Accordingly, the Court finds that Plaintiffs have not established a likelihood of success on their claim for breach of contract based on this alleged breach.

> ### ii. Plaintiffs have not established that Defendants likely acted outside of their "Permitted Discretion."

As to the second alleged breach, Plaintiffs contend Defendant Stonebriar breached the Guaranty Agreement by "exercis[ing] its alleged discretion" inconsistent with the contractually defined "Permitted Discretion" standard. (Doc. No. 55 at 14).[37] Regarding the specific instances in which Defendants allegedly breached the "Permitted Discretion" standard, the Court discerns the following: (i) "[Defendant Stonebriar] cancel[ing Encore Business] leasing contracts;" (ii) "[Defendant Stonebriar] sen[ding Encore Business] leasing opportunities to a direct competitor;" (iii) "[Defendant Stonebriar] instruct[ing] employees to conduct work unrelated to Encore

---

TWO) would resume "debt service payments in 2026" to be, at best, no more than Plaintiffs' *ipse dixit*. (Doc. No. 55 at 7). In any case, the Court finds this alleged understanding contradicted by the very words of Plaintiff Ward when he promised Defendant Stonebriar's employees that ". . . [c]ome hell or high-water we will restart interest payments October 1. It is an absolute priority for us and we are adjusting all operations as required accordingly." (Doc. No. 57-8 at 2).

[37] The Court notes that Plaintiffs once again cite not to the relevant contractual document (here, the Guaranty Agreement) to substantiate their assertions (here, regarding the purported "Permitted Discretion" standard contained therein)—for example, how it is defined, under what circumstances and to whom it is applicable, or otherwise—but instead cite to conclusory allegations in the Complaint and in the Ward Declaration.

Specifically, Plaintiffs state ". . . 'Permitted Discretion,' [ ] is defined in the Guaranty Agreement as 'a determination made in good faith and in the exercise of reasonable business judgment (from the perspective of a senior secured, asset-based lender).' (D. 1-1, Ex. A, ¶ 171); (Ward Decl., ¶ 8).)." (Doc. No. 55 at 14).

As for the cited paragraph of the Complaint, Paragraph 171, it asserts, "Stonebriar materially breached the Guaranty Agreement by failing to exercise its alleged discretion consistent with its contractual duty to do so within it [sic] 'Permitted Discretion,' which is defined in the Guaranty Agreement as 'a determination made in good faith and in the exercise of reasonable business judgment (from the perspective of a senior secured, asset-based lender).'" (Doc. No. 1-1 at ¶ 171).

Paragraph 8 of the Ward Declaration avers, "I have reviewed the Complaint (D. 1) and to the best of my knowledge, information, and belief the statements made therein are true and correct." (Doc. No. 55-1 at 4).

[Business]," and (iv) "[Defendant Stonebriar's] intention to sell the entire fleet of [Motorcoaches]." (Doc. No. 55 at 15-16).

In section I.a.iii of the Order below, the Court will detail why it finds that the alleged breaches (i) and (ii) by Defendant Stonebriar of the "Permitted Discretion" standard are unsubstantiated and not meriting any substantive analysis. As to alleged breach (iii), a review of the associated citation to the Weatherspoon Declaration reveals the following in support thereof:

> I [Weatherspoon] have expressed concern that [Defendant] Conner was directing Encore Business employees, including Angela Eicher, Mr. Thornton, and others, to perform work unrelated to Encore Business' core leasing operations and instead associate with separate business interests, including Nitetrain Aviation, Southern Charm, Travel Consultants, Inc., an ambulance-related business, and Luxury Coach Collision & Paint, Inc., among others. I further expressed concern that Encore payroll funds, computers, facilities, and operational equipment were being utilized in connection with those activities.

(Doc. No. 55-4 at ¶ 63.g). But Plaintiffs do not connect the above-asserted "work unrelated to Encore [Business]" (Doc. No. 55 at 15-16) to the relief sought in the Motion. Accordingly, the Court finds the above alleged breach of the "Permitted Discretion" standard irrelevant for purposes of the Motion.

Finally, as to point (iv), the Court observes that the Guaranty Agreement[38] defines "Permitted Discretion" as "a determination made in good faith and in the exercise of reasonable business judgment (from the perspective of a senior secured, asset-based lender)." (Doc. No. 57-5 at 6, § 1(a)(liv)). The Court further observes that in the Guaranty Agreement, the exercise of "Permitted Discretion" is in fact *contemplated* by the Sale of Auction Collateral that Plaintiffs place at issue in, and seek to enjoin via, the Motion:

> 11. Agent's Appointed Attorney-in-Fact. Each Grantor hereby irrevocably appoints Agent its attorney-in-fact, with full authority in the place and stead of such Grantor

---

[38] The preamble to the Guaranty Agreement defines Stonebriar as "Agent." (Doc. No. 57-5 at 2, (referring to "**STONEBRIAR COMMERCIAL FINANCE LLC**, as administrative agent (in such capacity, together with its successors and assigns in such capacity, 'Agent').")).

and in the name of such Grantor or otherwise, at such time as an Event of Default has occurred and is continuing under the Loan Agreement, to take any action and to execute any instrument which Agent may deem necessary or advisable in its *Permitted Discretion* to accomplish the purposes of this [Guaranty] Agreement, including:
(a) to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in connection with the Accounts or any other Collateral of such Grantor;

. . .

(d) to file any claims or take any action or institute any proceedings which Agent may deem necessary or desirable for the collection of any of the Collateral of such Grantor or otherwise to enforce the rights of Agent with respect to any of the Collateral

. . .

13. Agent's Duties. The powers conferred on Agent hereunder are solely to protect Agent's interest in the Collateral, and shall not impose any duty upon Agent to exercise any such powers. Except for the safe custody of any Collateral in its actual possession and the accounting for moneys actually received by it hereunder, Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral. Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its actual possession if such Collateral is accorded treatment substantially equal to that which Agent accords its own property.

(Doc. No. 57-5 at 25-26) (emphasis added). To the extent Plaintiffs intended to assert that the Sale itself violates the Guaranty Agreement's "Permitted Discretion" standard (separate and apart from Plaintiffs' UCC claim), Plaintiffs simply failed to make this assertion in the Motion.

For the foregoing reasons, the Court finds Plaintiffs have not established a likelihood of success on their claim for breach of contract based on this alleged breach.

### iii. Plaintiffs have not established that Defendants diverted or canceled Encore Business leasing opportunities.

As to the fifth alleged breach, Plaintiffs' assertion that "Stonebriar and their co-conspirators divert[ed] all leasing business away from Encore" (or relatedly, that Defendant Stonebriar "canceled [Encore Business] leasing contracts" (Doc. No. 55 at 15)) is similarly conclusory and

undercut by the documents before the Court. (Doc. No. 55 at 15). Regarding diversion of leasing business, this allegation first appears in the factual background to the Motion, (Doc. No. 55 at 9), and is supported by a citation to the Ward Declaration as well as to the Weatherspoon Declaration, both of which the Court respectively quotes verbatim below:

> Among the most damaging ongoing acts affecting the Encore Enterprise business is the diversion of Encore Enterprise client relationships during the critical 2026 tour booking cycle. On information and belief, Jennifer George ("George"), a leasing agent formerly associated with Conner, has been directing existing and prospective Encore TN clients to Transportation Charter Services ("TCS"), a company owned by Terry Fischer, an associate of Conner . . .

(Doc. No. 55-1 at ¶ 24).

> I have expressed concern that, following the engagement of Jennifer George as a leasing agent by Mr. Conner under the newly asserted management structure, certain leasing opportunities historically associated with the Encore Business were sent to a competing provider, Transportation Charter Services. Based on that booking data and related communications, I have expressed concerns that this has resulted in material lost revenue and client base for the Encore Business.

(Doc. No. 55-4 at ¶ 63.f). These assertions are so conclusory and devoid of factual development that the Court finds that they provide virtually no support for the proposition that "Stonebriar and their co-conspirators divert[ed] *all leasing business* away from Encore." (Doc. No. 55 at 15, emphasis added).[39] To begin with, neither declarant offers a single example of such allegedly diverted Encore Business clients. Indeed, the Ward Declaration's supporting assertions to this point are made merely on "on information and belief." (Doc. No. 55-1 at ¶ 24). As far as the Court can tell, the "information" comes to the first declarant (Ward) only secondhand, and that "information" and the basis for the "belief" are left unidentified. (*Id.*). And Plaintiffs do not offer

---

[39] The Court likewise finds that the Motion's assertion that "[u]nder [Defendant] Stonebriar's control[,] Encore has canceled leasing contracts" (Doc. No. 55 at 15) to be conclusory and devoid of factual development—as, again, neither declarant offers a single example of such allegedly canceled Encore Business "leasing contracts." (*Id.*).

the "booking data and related communications," (Doc. No. 55-4 at 10, ¶ 63.f), that the second declarant (Weatherspoon) allegedly reviewed.

And although Plaintiffs rely at times (*e.g.,* Doc. No. 55 at 9-10, 19) on the "Ward Organization, LLC Business Assessment Report" dated February 18, 2026, and prepared by CR3 Partners (hereafter, the "CR3 Report"), the Court perceives that the CR3 Report further undercuts Plaintiffs' allegation that Encore Business touring business and associated leases were entirely lost due to Defendants' diversionary efforts because the CR3 Report ascribes lost and/or expected 2026 tours to reasons other than Defendants' diversionary efforts.[40] Finally, as to Plaintiffs' allegations that Jennifer George was the linchpin of diversionary efforts away from the Encore Business to competitors, the Court finds this allegation likewise uncorroborated and undercut by the documents before the Court, specifically the partial transcript containing the testimony of Defendant Conner given at the February 24, 2026 hearing on a temporary injunction in Texas Business Court, Case No. 25-BC01A-0059. (*See* Doc. No. 57-13 at 6-7, 17-18).

Even assuming *arguendo* that Plaintiffs' allegation that Defendant Stonebriar "divert[ed] *all leasing business* away from Encore" was affirmatively supported by more than conclusory

---

[40] Indeed, the CR3 Report refers to the following eight "cancel[ed] . . . acts that had been expected for 2026." (Doc. No. 36-2 at 35). Although CR3 Partners cautions that it has not "independently confirmed these notes," (*id.*), the Court emphasizes that these lost tours and the associated explanations in the CR3 Report do not aide Plaintiffs with respect to their allegation that "all [Encore] leasing business" was lost due to Defendants' diversionary efforts. (Doc. No. 55 at 15).

| LT Tours | Note | 2025 Sales |
|---|---|---|
| Thomas Rhett | Cancelled 2026 Tour – Unknown why [Tour Note – 2026 Tour] | 600,000.00 |
| Nate Bargatze | Equipment | 929,705.44 |
| Nate Smith | Stopped responding | 341,667.71 |
| Phish | Believe they were already planning on leaving, pushed after Nov 6 | 1,949,563.31 |
| Trey Anastasio | Believe they were already planning on leaving (lead singer of Phish) | 88,464.58 |
| Zach Top | Lost (quote value $2,288,900) Instability was reason given | 1,461,289.91 |
| Megan Moroney | 9 buses | 4,590,00.00 |
| Riley Green | Lost due to instability | 1,200,000.00 |

assertions and not undercut by the documents before the Court, Plaintiffs fail to articulate legal argument or analysis as to how such "diver[sion of] all leasing business away from Encore" breached the "contractual duty of good faith and fair dealing." (Doc. No. 55 at 15, emphasis added). Plaintiffs likewise fail to articulate legal argument or analysis as to the nature, extent, existence, or significance of a "contractual duty of good faith and fair dealing." (*Id.*). But no matter, as under Tennessee law, "absent a valid claim for breach of contract, there is no [independent] cause of action for breach of implied covenant of good faith and fair dealing."[41] *SecurAmerica Bus. Credit v. Schledwitz*, No. W2012–02605–COA–R3–CV, 2014 WL 1266121 (Tenn. Ct. App. 2014) (citations omitted). As detailed above, Plaintiffs have failed, in various ways, to articulate a breach of contract by Defendants. For this reason, and the reasons alluded to in most recent footnote, the Court need not and does not delve further into the alleged existence and breach of the covenant of good faith and fair dealing specifically.

In sum, the Court finds that Plaintiffs fail to show a likelihood of success on the merits for their claim for breach of contract.

---

[41] One might ask what relevance the covenant has to anything at all, if its breach is not grounds for an independent cause of action. The undersigned has written on this topic before. Under Tennessee law, the covenant of good faith and fair dealing is implicitly part of every contract. *See Evans*, 589 F. Supp. 3d at 899. As such, the covenant does have a role in a breach of contract claim; Tennessee courts have described the covenant as being "a part of" a breach-of-contract claim.

The undersigned previously has "provide[d] his view about how breach of the covenant of good faith and fair dealing comprises 'a part' of a breach-of-contract claim[.]" *See id.* In his view, the idea is that "if the defendant is properly considered to have breached the covenant of good faith and fair dealing— meaning, in essence, engaging in bad faith and unfair actions that prevent the occurrence of circumstances whereby the plaintiff would get the benefit of his bargain—the defendant cannot raise the non-occurrence of such circumstances as a defense to the plaintiff's breach of contract claim." *Id.; see also id.* at 900 (explaining the basis for this view). The Court does not perceive (and Plaintiffs do not explain) how the covenant, by virtue of being "part of" a breach-of-contract claim, somehow aids Plaintiffs in any breach-of-contract claim in this case.

### b. *Breach of Fiduciary Duty*

The Court discerns that the parties disagree as to the law properly applicable to Plaintiffs' claim for breach of fiduciary duty. In their Motion, Plaintiffs generally cite Tennessee law in support of their claim for breach of fiduciary duty but—just as with Plaintiffs' breach of contract claim—fail to explain why Tennessee law is applicable to this claim. (*See* Doc. No. 55 at 16-18). And there is reason to question the applicability of Tennessee law here.

As Plaintiffs themselves allege in the Complaint, with the exception of Plaintiff Encore Luxury Coach Leasing, TN Inc. (a "Tennessee Corporation," Doc. No. 1-1 at ¶ 9) and Plaintiff ACBI, LLC (a "Tennessee Limited Liability Company," *id.* at ¶ 19), each and every Plaintiff business entity is a Delaware entity (*see id.* at ¶¶ 8-22). On this basis, Defendants respond that pursuant to Tennessee's internal affairs doctrine, all breach of fiduciary duty claims as to such Delaware-formed Plaintiff entities are to be analyzed under Delaware law. (Doc. No. 57 at 18, n.13). However, even assuming *arguendo* that Tennessee law governs Plaintiffs' breach of fiduciary duty claim, for the following reasons Plaintiffs fail to show a likelihood of success as to Plaintiffs' breach of fiduciary duty claim.

Under Tennessee law, a claim for breach of a fiduciary duty requires: "(1) a fiduciary relationship, (2) breach of the resulting fiduciary duty, and (3) injury to the plaintiff or benefit to the defendant as a result of that breach." *Ann Taylor Realtors, Inc. v. Sporup*, No. W2010-00188-COA-R3-CV, 2010 WL 4939967 at *3 (Tenn. Ct. App. Dec. 3, 2010). Tennessee law "disfavors the finding of a fiduciary relationship in the context of a banking relationship." *Power & Tel. Supply Co. v. Suntrust Banks, Inc.*, No. 03-2217 M1/V, 2005 WL 1329208, at *3 (W.D. Tenn. May 10, 2005). Absent special facts and circumstances, "the dealings between a lender and borrower are not inherently fiduciary." *Oak Ridge Precision Indus., Inc. v. First Tennessee Bank*

*Nat'l Ass'n,* 835 S.W.2d 25, 30 (Tenn. Ct. App. 1992). And when a debtor is authorized to take the action complained of, such action represents "no breach of fiduciary duty." *In re Barber*, 605 B.R. 495, 504 (Bankr. M.D. Tenn. 2019); *see also Fruehauf's Est. v. Comm'r of Internal Revenue*, 427 F.2d 80, 86 (6th Cir. 1970) ("There is, however, an equally well-established countervailing rule of law that a fiduciary may be authorized by the terms of the instrument creating his powers to do that which in the absence of such provision would be a violation of his fiduciary duty of loyalty.").

Plaintiffs contend that they were owed a fiduciary duty "[p]ursuant to [sic] Loan Agreement and section 16(a) of the Guaranty Agreement" because certain "Plaintiffs pledged and granted Stonebriar their proxy and power of attorney to exercise certain rights in regard to TWO and Encore . . . [which] created an agency and fiduciary relationship between Stonebriar and those Plaintiffs." (Doc. No. 55 at 16). In support thereof, Plaintiffs cite *Mitchell v. Johnson*, 646 S.W.3d 754, 766 (Tenn. Ct. App. 2021) for the proposition that "[a]gents (attorneys-in-fact) acting pursuant to a power of attorney have a fiduciary relationship with the principal." (*Id.* at 16-17). Plaintiffs further contend that Stonebriar "assumed" and/or "created" fiduciary duties through "subsequent control over Encore" and by serving as "TWO's broker while negotiating with [Defendant] Tim Conner . . . regarding due diligence, the terms of the Acquisition and negotiated the Settlement Agreement with Conner on behalf of TWO, Ward and Williams and thereby created an agency and fiduciary relationship between Stonebriar and the Plaintiffs." (*Id.* at 17). As to the contours of this alleged fiduciary duty, Plaintiffs claim that "[a] fiduciary is obligated to deal with the property of his principal in the 'utmost good faith.'" (*Id.* at 17, quoting *Ralston v. Hobbs*, 306 S.W.3d 213, 221 (Tenn. Ct. App. 2009)).

The Court discerns that Plaintiffs contend the following actions constituted breaches of fiduciary duty by Defendant Stonebriar: "exercising alleged rights in violation of the parties' contracts, falsely claiming ownership over Encore, failing to preserve assets of TWO and Encore, destroying the assets of TWO and Encore, . . . attempting to coerce TWO, Williams and Ward to surrender their ownership interest . . . hiring Conner as CEO with an annual compensation of $300,000; the cancellation of leasing contracts; sending leasing opportunities to a direct competitor; and instructing employees to conduct work unrelated to Encore." (Doc. No. 55 at 18). Plaintiffs appear to contend also that via its causing the Sale to occur, Defendant Stonebriar would further breach its fiduciary duties because the Sale would "fail to preserve [Encore Business] assets . . . destr[oy Encore Business] assets . . . [and] would effectively destroy Encore [Business] by selling off [the Motorcoaches]." (*Id.*).

However, Plaintiffs make no attempt to explain *why* such actions breach any fiduciary duty or, relatedly, the sense in which any fiduciary duty is thereby breached.[42] At base, these *alleged* breaches of *alleged* fiduciary duty by Defendants fall into three categories: (i) allegations regarding Defendants' conduct leading up to the November 6, 2025, transition of control of the Encore Business via the Pledge Exercise Note; (ii) allegations regarding Defendants' conduct and governance of the Encore Business following the November 6, 2025 transition of control; and (iii) allegations regarding Defendants' decision to conduct the Sale and dispose of the Motorcoaches.

---

[42] Further, many assertions Plaintiffs *do* make here are not corroborated by the declarations Plaintiffs cite in support thereof. Plaintiffs proffer "the cancellation of leasing contracts" as an example of Stonebriar and Connor having "engaged in multiple conflicts of interest. (Doc. No. 55 at 18). Plaintiffs cite the Weatherspoon Declaration at paragraph 50 in support—but that reads "[s]ince that date, tours that were canceled or proceeded with competing providers have resulted in lost revenue opportunities exceeding $11,000,000 to date." (Doc. No. 55-4 at ¶ 50). The Weatherspoon Declaration, at least at the point which Plaintiffs cite, *does not* attribute canceled "tours" to Defendants Stonebriar or Conner, or allege that these Defendants caused such tours to "proceed[ ] with competing providers." (*Id.*).

And as stated previously by the Court, only the third category of alleged breaches of fiduciary duty is relevant for purposes of the Motion.

Returning to the alleged bases giving rise to Defendants' fiduciary duty, Plaintiffs do not assert that the Sale and associated disposition of the Motorcoaches arise from the Defendants' exercise of "proxy and power of attorney rights" in the various Plaintiff entities. (Doc. No. 55 at 16). This is likely because the Sale arises out of Defendants' exercise of contractual default rights to possess and to dispose of the Collateral, pursuant to the Guaranty Agreement:

> Upon the occurrence and during the continuance of an Event of Default [ ] Agent may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein, in the other Loan Documents, or otherwise available to it, all the rights and remedies of a secured party on default under the UCC or any other applicable law. Without limiting the generality of the foregoing, each Grantor expressly agrees that, in any such event, Agent . . . may take immediate possession of all or any portion of the Collateral and . . . sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of Agent's offices or elsewhere, for cash, on credit, and upon such other terms as Agent may deem commercially reasonable.

(Doc. No. 57-5 at 27, § 17(a)). Even assuming *arguendo* that Plaintiffs are owed a fiduciary duty by Defendants and that such duty is implicated by the Sale, Plaintiffs expressly authorized the Sale in the contractual document giving rise to the purported fiduciary duty:

> Each of the Guarantors authorizes Agent without notice or demand (other than any notice expressly required to be provided hereunder or under any other Loan Document), and without affecting or impairing its liability hereunder, to the extent not prohibited by applicable law, from time to time to . . . (ii) take and hold security for the payment of the Obligations and *sell*, exchange, release, impair, surrender, realize upon, collect, settle, or otherwise deal with in any manner and in any order *any property at any time pledged or mortgaged to secure the Obligations or any of the Guarantied Obligations* (including any of the obligations of all or any of the Guarantors under this Guaranty) incurred directly or indirectly in respect thereof or hereof, or any offset on account thereof . . ."

(*Id.* at 9-10, § 2(f), emphasis added). And further, the parties to the Guaranty Agreement acknowledged that "the powers conferred on Agent [Stonebriar] hereunder are solely to protect

Agent's interest in the Collateral . . . [e]xcept for the safe custody of any Collateral in its actual possession and the accounting for moneys actually received by it hereunder, Agent shall have no duty as to any Collateral . . . ." (*Id.* at 25-26, § 13). This effectively constitutes a (valid) disclaimer of any fiduciary duty; even though an agent typically owes a principal a fiduciary duty, that expressly was not the case here for the so-called "[a]gent."

For these reasons, Plaintiffs fail to establish that the Sale likely violates a fiduciary duty that they contend Defendants owed them. *See In re Barber*, 605 B.R. at 504; *Fruehauf's Est.*, 427 F.2d at 86 (6th Cir. 1970). Accordingly, the Court finds that Plaintiffs fail to show a likelihood of success on the merits for their claim of breach of fiduciary duty.

### c. Fraudulent Inducement

As both sides cite Tennessee law in their respective briefings as to Plaintiffs' claim of fraudulent inducement, the Court will apply Tennessee law in analyzing that claim. Under Tennessee law, a claim of fraudulent inducement requires: "(1) a false statement concerning a fact material to the transaction; (2) knowledge of the statement's falsity or utter disregard for its truth; (3) intent to induce reliance on the statement; (4) reliance under circumstances manifesting a reasonable right to rely on the statement; (5) an injury resulting from the reliance." *Lamb v. MegaFlight, Inc.*, 26 S.W.3d 627, 630 (Tenn. Ct. App. 2000).

The Court discerns that Plaintiffs assert the following statements constitute false statements (and the associated transactions) establishing the first element of a claim of fraudulent inducement. First, that "Stonebriar, Hirsch and Wilkison represented that Stonebriar would restructure the Loan Agreement, but the Settlement Agreement had to be executed [by Plaintiffs] first." (Doc. No. 55 at 21). Second, that Defendant Stonebriar, via Defendants Hirsch and Wilkinson, "directed TWO and Encore to deploy all available earnings and personal equity infusions into restoring the

Nitetrain Fleet—rather than making scheduled debt service payments" on the basis of "repeated[ ] representations . . . between 2024 and November 2025 . . . that (i) interest would be treated as 'Paid-in-Kind' ('PIK'), and (ii) Stonebriar would restructure the Loan [Agreement] into a sustainable credit facility once the fleet was restored and debt service resumed." (*Id.*).

But Plaintiffs fail to address how the alleged oral statements by Defendants regarding future modifications to the Loan Agreement could have been "reasonably relied on" by Plaintiffs, *Noblin*, 2007 WL 1574273 at *9, given that the Loan Agreement required a writing signed by Stonebriar to effect any "amendment or waiver of any provision of [the Loan Agreement] and any consent to any departure by [TWO] from any provision of [the Loan Agreement]."[43] The Forbearance Agreement similarly disclaims the effectiveness of purported subsequent oral modifications.[44] And Plaintiffs do not attempt to reconcile the claim of "reasonable reliance" with Plaintiff Ward's September 3, 2025 email to Defendant Stonebriar's employees promising to resume interest payments within the month.[45] Accordingly, the Court finds that Plaintiffs fail to show a likelihood of success on the merits of their claim of fraudulent inducement.

### d. UCC Claim

The Court discerns that the parties disagree as to what law is applicable to Plaintiffs' UCC claim. In their Motion, Plaintiffs generally cite Tennessee law in support of their UCC claim but—

---

[43] Although under Tennessee law, "there is no rule that a merger clause makes reliance on oral representations unreasonable *per se* so as to necessarily defeat a fraudulent inducement or promissory fraud claim," the Court refers to its analysis above articulating the legal standard for a TRO and/or a preliminary injunction and reminds Plaintiffs of their burden in seeking the extraordinary relief of a TRO. *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 568 (6th Cir. 2003).

[44] "This written [Forbearance] Agreement represents the final agreement between and among the parties hereto with respect to the matters set forth in this Agreement and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements. There are no unwritten oral agreements between or among the parties hereto." (Doc. No. 57-7 at 9, § 20(c)).

[45] ". . . Come hell or high-water we will restart interest payments October 1. It is an absolute priority for us and we are adjusting all operations as required accordingly." (Doc. No. 57-8 at 2).

just as with Plaintiffs' other claims—fail to explain why Tennessee law is applicable to this claim. (*See generally* Doc. No. 55 at 19-20). Defendants point to the Guaranty Agreement's choice-of-law provision (which specifies New York law) and argue that New York law likewise governs Plaintiffs' UCC claim because it arises under the disposition of collateral governed by the Guaranty Agreement. (Doc. No. 57 at 20, n.15). However, even assuming *arguendo* that Tennessee law governs Plaintiffs' UCC claim, for the following reasons Plaintiffs fail to show a likelihood of success on their UCC claim under Tennessee law.

Tenn. Code Ann. § 47-9-610 provides that "[a]fter default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing," subject to the condition that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." Tenn. Code Ann. § 47-9-610(a)-(b). Seeking to put their spin on that statute's reference to "commercially reasonable preparation or processing," Plaintiffs seize on a related statute, namely Tenn. Code Ann. § 47-9-627. But Plaintiffs misrepresent the provisions of Tenn. Code Ann. § 47-9-627, claiming that:

> According to Tenn. Code Ann. § 47-9-627(a), a disposition of collateral is made in a commercially reasonable manner if made: (1) In the usual manner on any recognized market; (2) At the price current in any recognized market at the time of the disposition; *and* (3) Otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.

(Doc. No. 55 at 20, emphasis added). As a preliminary matter, the relevant portion of Tenn. Code Ann. § 47-9-627 is subsection (b)—and not subsection (a) as represented by Plaintiffs (Doc. No. 55 at 20). More importantly, in their Motion Plaintiffs mischaracterize *disjunctive* requirements for rendering a disposition of collateral "commercially reasonable" under Tenn. Code Ann. § 47-9-627 as *conjunctive* requirements. Tenn. Code Ann. § 47-9-627 *actually* reads:

> A disposition of collateral is made in a commercially reasonable manner if the disposition is made: (1) in the usual manner on any recognized market; (2) at the price current in any recognized market at the time of the disposition; *or* (3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.

Tenn. Code Ann. § 47-9-627(b) (emphasis added). Regardless, Tenn. Code Ann. § 47-9-625 contemplates that "[*i*]*f it is established that* a secured party is not proceeding in accordance with this chapter, a court *may* order or restrain collection, enforcement, or disposition of collateral on appropriate terms and conditions." Tenn. Code Ann. § 47-9-625(a) (emphasis added). In the Motion, Plaintiffs assert the following:

> Here, the business disputes the very collateral seizure itself which breached the peace without judicial process in violation of the law. Allowing the lender to profit from that violation would undermine this Court's authority to enforce the law, and by itself, justifies a preliminary injunction pending this court's adjudication of that claim. Equally, the May 28, 2026 sale violates every principle of commercial reasonableness, as the sale is not done in the "usual manner" nor "on any recognized market"; not at a price "current in any recognized market"; and not "otherwise in conformity with reasonable commercial practices" amongst like businesses. Indeed, the incentive is for the lowest possible price of bidders so that the bank can credit bid to seize the assets for itself, precisely the kind of incentive the law forbids.

(Doc. No. 55 at 20). Beyond reciting Tenn. Code Ann. § 47-9-627's *disjunctive* requirements for rendering disposition of collateral "commercially reasonable," Plaintiffs do nothing more than assert that the Sale "incentiv[izes] . . . the lowest possible price of bidders." (Doc. No. 55 at 20). But Plaintiffs offer nothing to substantiate even this single (conclusory) assertion; they offer no reason *why* the Sale so incentivizes the lowest possible price of bidders, or *how* such a Sale would "establish[ ]" that Stonebriar "is not proceeding in accordance with [Tenn Code Ann. § 47-9-601 *et seq*]" as to invoke the applicability of Tenn. Code Ann. § 47-9-625. As Defendants note, "Plaintiffs have not shown that Stonebriar's proposed foreclosure process is faulty in any way— let alone commercially unreasonable." (Doc. No. 57 at 21). Because Plaintiffs, in briefing their UCC claim in support of the Motion, offer no more than statutory citations and conclusory

assertions, the Court need not reach the question of whether a showing sufficient to warrant the remedy provided by Tenn. Code Ann. § 47-9-625[46] would equate to showing a likelihood of success on the merits of a UCC claim under Tennessee law. Accordingly, the Court finds that Plaintiffs have not established a likelihood of success on their UCC claim.

II.        Irreparable Harm

While unnecessary in light of Plaintiffs' failure to establish a likelihood of success on the merits of any of the claims briefed in the Motion being fatal to said Motion, the Court (in the interest of comprehensiveness) will briefly analyze the remaining TRO requirements and the parties' briefing thereon. Accordingly, the Court will consider next whether Plaintiffs will suffer irreparable harm without the requested TRO. "Rule 65(b) is clear that the possibly drastic consequences of a restraining order mandate careful consideration by a trial court faced with such a request." *Westfield Ins. Co. v. Pavex Corp.*, No. 17-14042, 2017 WL 6407459, at *1 (E.D. Mich. Dec. 15, 2017). It is well-established that "a plaintiff's harm is not irreparable if it is fully compensable by money damages." *Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir. 1992). However, the Sixth Circuit has recently reiterated that "interference with customer relationships and damage to reputation are precisely the sorts of injuries this circuit has said are difficult to quantify monetarily, and thus constitute irreparable harm." *ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 503 (6th Cir. 2022) (citing *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007)); *Basicomputer*, 973 F.2d at 512 (6th Cir. 1992)). Furthermore, "[t]he impending loss or financial ruin of [a] business constitutes irreparable injury." *Performance Unlimited, Inc. v. Questar Publishers, Inc.,* 52 F.3d 1373, 1382 (6th Cir. 1995).

---

[46] A showing which, to be clear, Plaintiffs failed to make.

Plaintiffs assert that the Sale would dispose of "essentially all of Plaintiffs' assets" and destroy Plaintiffs' "ability to generate revenue" (Doc. No. 55 at 25)—presumably because, without the Motorcoaches, the Encore Business necessarily cannot conduct the luxury entertainer motorcoach leasing activities crucial to the Encore Business' success.[47] Defendants respond that the Sale, Plaintiffs' alleged irreparable harm, is the product of contractually bargained-for default and foreclosure rights. (Doc. No. 57 at 10). Defendants conclude from this that the Sale, representing the culmination of such rights, is a harm self-inflicted by Plaintiffs upon themselves, and thus something that "cannot satisfy the requirement of irreparable harm necessary to obtain any injunctive relief." (*Id.*). In support of this proposition, Defendants cite *Livonia Props. Holdings, LLC v. 12840-12976 Farmington Rd. Holdings, LLC.* (*Id.*). The Court finds that case distinguishable. In *Livonia Props. Holdings, LLC*, a borrower ("Borrower") moved for a TRO to enjoin an imminent foreclosure sale of real property by the lender ("Lender") following Borrower's default on the loan secured by the real property. *Livonia Property Holdings, L.L.C. v. 12840-12976 Farmington Road Holdings, L.L.C.*, 717 F.Supp.2d 724, 741 (E.D. Mich. 2010). The district court denied Borrower's TRO motion, and on appeal, the Sixth Circuit affirmed that denial.

[47] Plaintiffs at times mention property in Whites Creek, Tennessee, (the "Property") and contend that its sale presents another irreparable harm Plaintiffs face in the absence of the Proposed TRO. (*See, e.g.,* Doc. No. 55 at 2-3). Although it is true that foreclosure can sometimes constitute irreparable harm so as to justify the issuance of a preliminary injunction, *see, e.g., Sayo, Inc. v. Zions First Nat'l Bank*, No. 06–14963, 2006 WL 3240706 at *2 (E.D. Mich. Nov. 7, 2006), the mere threat of future foreclosure is simply not sufficient to warrant issuance of a preliminary injunction. *See e.g., Doss v. Citizens Sav. & Tr. Co.*, No. 3:19-0265, 2019 WL 13260267, at *2 (M.D. Tenn. May 30, 2019) ("In the absence of an imminent foreclosure, the mere threat or possibility of a foreclosure does not support the issuance of an injunction."), *report and recommendation adopted sub nom. Doss v. Citizens Sav. & Tr. Co.*, No. 3:19-CV-00265, 2019 WL 13260266 (M.D. Tenn. June 25, 2019); *Bilyeu v. UT-Battelle, LLC*, No. 3:21-CV-352, 2021 WL 6338400, at *8 (E.D. Tenn. Oct. 29, 2021) (same).

Defendants note via the Response that the Property is not included in the Sale. (Doc. No. 57 at 11, n.11). Plaintiffs neither rebut this assertion by Defendants nor cite to any portion of the Sale Notice suggesting that the Property is noticed for or otherwise scheduled for sale, in the Sale or otherwise. Accordingly, the Court finds no imminent threat of a foreclosure of the Property so as to justify the issuance of Plaintiffs' requested preliminary injunctive relief on these grounds.

*Livonia Props. Holdings, LLC v. 12840-12976 Farmington Rd. Holdings, LLC*, 399 F. App'x 97 (6th Cir. 2010).[48]

In considering the irreparable harm requirement of the TRO analysis, the district court relied on its conclusion that Borrower's alleged harms from the sale Borrower sought to enjoin were or would be "self-inflicted." *Livonia I,* 717 F.Supp.2d at 740. The district court grounded this conclusion in the finding that Borrower "admitted [Borrower's] default" and otherwise did not contest default. *Id.* at 741. The district court went on to conclude both that Borrower failed to provide any "evidence of a likelihood of loss of goodwill sufficient to justify an injunction" and that "because Borrower is permitted to redeem after the sale, it has not shown that irreparable harm will occur at the time of the foreclosure sale." *Id.* at 740-41.

In affirming the district court's denial of a TRO, the Sixth Circuit noted that the district court's two above-referenced conclusions represented "two bases" for the district court's "conclusion" that the Borrower was "unlikely to suffer irreparable harm." *Livonia II*, 399 F. App'x at 104. The Sixth Circuit held that "neither [basis] is clearly erroneous" and further held that the district court's ultimate conclusion on the irreparable harm requirement of the TRO analysis was not clearly erroneous. *Id.*

In the instant case, Plaintiffs (unlike the *Livonia I / II* TRO movant) appear to lack not only a statutory redemption right, but also any ability to bid on or otherwise attempt to purchase the Motorcoaches.[49] Further, if the Motorcoaches were sold, Plaintiffs would face either "[i]mpending

---

[48] For the sake of clarity, the Court will refer to the opinion of the United States District Court for the Eastern District of Michigan as "*Livonia I,*" and to the opinion of the United States Court of Appeals for the Sixth Circuit as "*Livonia II.*"

[49] The Forbearance Agreement states, in pertinent part: "Post-Default Waiver of Collateral Disposition Rights. Each Loan Party hereby waives (a) any and all rights that it may have to notification of disposition of the Collateral under Section 9-611 of the Uniform Commercial Code; and (b) any and all rights that it

loss or financial ruin [of the Encore Business],” as “virtually all of [the Encore Business's] revenue is generated by those [M]otorcoaches,”(Doc. No. 55-4 at ¶ 70), or “loss of customer goodwill and other competitive losses,” as the Encore Business could not conduct its touring business and such Encore Business clients would necessarily flow to competitors,[50] or both. *Basicomputer*, 973 F.2d at 512 (6th Cir. 1992), *Performance Unlimited, Inc.,* 52 F.3d at 1382 (6th Cir. 1995). Accordingly, the Court finds that Plaintiffs have shown a likelihood of establishing irreparable harm in the absence of the requested relief. Nevertheless, Plaintiffs cannot prevail, because they have failed to satisfy other requirements.

### III. Balance of Equities

Next, the Court will assess the balance of equities. A party seeking a preliminary injunction must also show that the balance of equities tips in the movant's favor. *Winter*, 555 U.S. at 20. Seeking to minimize the equities that favor Defendants, Plaintiffs asserts that the requested TRO and preliminary injunction would not harm Defendants “in any material way” because Defendants “seized the Plaintiff Entities and their assets” five months ago. (Doc. No. 55 at 25). Then, in an apparent attempt to cast the requested relief as a *benefit* to Defendants, Plaintiffs then layer the *contingent possibility* that the Court may grant Plaintiffs' pending Motion to Appoint Receiver with the *contingent possibility* that Plaintiffs' requested receiver will “likely increase the value” of the collateral (*Id.*). Plaintiffs conclude this threadbare analysis of the third TRO (and preliminary

---

may have to the right to redeem the Collateral or any other collateral securing the Loans under Section 9-623 of the Uniform Commercial Code.” (Doc. No. 57-7 at 8).

[50] The Court notes, but does not find fatal to its conclusion regarding irreparable harm, Plaintiffs' assertions that the Motorcoaches were, *e.g.*, “clear[ed of] all contract leases . . . during the 2026 tour season.” (Doc. No. 55 at 10). Such assertions appear to undercut a showing of “a likelihood of loss of goodwill sufficient to justify an injunction” arising from the Sale and associated disposition of the Motorcoaches. *Livonia I*, 717 F.Supp.2d at 740-41. That is, insofar as the Motorcoaches presently lack contract leases for the 2026 tour season, then the Sale would not result in a loss of goodwill arising from the Encore Business's inability to satisfy existing contract leases.

injunction) requirement with a conclusory statement that because Defendant Stonebriar (supposedly) wrongfully controls the "subject assets" and "told the Court [that] Encore is stabilizing," "there is no potential for harm to others" in enjoining the Sale. (*Id.*).

Defendants contend that the balance of equities weigh in their favor, as Plaintiffs' allegation that the "value of the Encore Business is rapidly deteriorating in real time" coupled with Defendants' allegations of interference by Plaintiffs Ward and Williams as to the Encore Business demonstrates that "significant harm" would come to Stonebriar should the Court enjoin the Sale. (Doc. No. 57 at 24-25). Specifically, Defendants contend that "[d]elays [in conducting the Sale will] sow additional confusion in the marketplace, will chill bidding, and will lead to uncertainty for Stonebriar in attempting to preserve the value of its collateral." (*Id.* at 25).

The Court disagrees with Defendants on this point. Although postponing the Sale may "sow confusion," the confusion likely would be only as to why the Sale was postponed. And although postponing the Sale obviously "chill[s] bidding" in the sense that no bidding can occur during the period of postponement, it is not clear that it would "chill bidding" once that period is over and the Sale actually occurs. (*Id.*). In particular, it is not clear that a postponement would chill bidding in the sense of keeping down the number of bidders, the enthusiasm of bidders, or (relatedly) the amount of bids once the Sale does occur after any delay. And on the related topic of preservation of the value of the collateral Motorcoaches to be sold, as Plaintiffs note, Defendants do not articulate "how the value of the [Motorcoaches] will be affected by any delay in the [Sale] or the rapid[ ] deteriorat[ion of the Encore] [B]usiness." (Doc. No. 58 at 6). And the Court does not discern, on the record before the Court, any reason that a delay in the Sale or the further deterioration of the Encore Business would affect the value of the Motorcoaches. Indeed, in the

Court's estimation, the value of the Motorcoaches likely is largely and perhaps virtually independent from the value of the Encore Business.

Accordingly, the Court finds the harm to Defendants from enjoining the Sale is more properly measured by the costs of rescheduling the Sale, as well as that which necessarily flows from such rescheduling (*e.g.,* storing and maintaining the Motorcoaches in the interim). As weighed against the harm to Plaintiffs, namely the harm to the Encore Business from the Sale of, among other Auction Collateral, the Motorcoaches, the Court finds Plaintiffs have established that the balance of equities favor Plaintiffs. Nevertheless, Plaintiffs cannot prevail, because they have failed to satisfy other requirements.

IV.    Public Interest

Finally, the Court will determine whether Plaintiffs have shown that the public interest favors an injunction. *Winter*, 555 U.S. at 20. Plaintiffs purport to state "two reasons" why the "public interest will be served by a preliminary injunction." (Doc. No. 55 at 25-26). However, the Court discerns, at best, only *one* purported reason in Plaintiffs' difficult-to-parse section IV.D— that the public's interest in "[o]rderly administration of justice" is served by enjoining "armed takeovers" by "lenders or others with alleged rights in the assets of others," particularly Defendant Stonebriar's use of "armed guards to infiltrate the Encore headquarters, seize assets, and ban the rightful owners of the entities and property therefore . . . " (*Id.*). But the Court need not delve into the odiousness of such actions to the public interest. as the Court perceives Plaintiffs' public interest arguments to be, at base and as more cogently articulated in Plaintiffs' Reply supporting the Motion, an argument that the public interest is served by the enforcement of contractual obligations and protection of vested rights. (*See* Doc. No. 58 at 6).

As Defendants note, the Sixth Circuit recognizes and affirms this point. *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 887 (6th Cir. 2025) ("The public interest is served by enforcing contractual agreements and protecting vested rights"). Defendants contend that the public interest in upholding and enforcing contracts, as well as protecting vested rights, in fact favors Defendants rather than Plaintiffs. (Doc. No. 57 at 24-25). In support, Defendants argue that enjoining the Sale would deprive Defendants of "valuable bargained-for rights," which were the product of negotiation by Defendants and Plaintiffs, all sophisticated business parties represented by counsel throughout such negotiation. (*Id.* at 25). Per Defendants, enjoining the Sale may further "have a chilling effect on the availability of credit, and would sow doubt in contracting parties' confidence that courts will enforce their bargained for rights." (*Id.*).

But here, just as in *EOG Res., Inc.*, how the public interest is better served turns on *which* party possesses *what* rights under the contractual documents. *See EOG Res., Inc.*, 134 F.4th at 887. As in *EOG Res., Inc.*, here the Court cannot determine "which side the public interest favors, at least not without turning back to the merits." *Id.*

And when the Court does turn back to the merits, this factor does not favor Plaintiffs. In light of the Court's conclusion that Plaintiffs have not established a likelihood of success on the merits, the Court finds that Plaintiffs have not established as required that the public interest in enforcement of contractual obligations and protection of vested rights is served by granting the Proposed TRO.

<u>CONCLUSION</u>

"A preliminary injunction [or TRO] is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary*

*v. Daeschner*, 228 F.3d 729,739 (6th Cir. 2000)). It bears emphasizing why a TRO is deemed an extraordinary remedy subject to stringent requirements: the party receiving it is treated, while the litigation is ongoing, in some respects as if it had ultimately prevailed on its claims even though it has not yet done so and could not possibly do so until the litigation is concluded. It is no small thing for a party to be treated (even if only temporarily and for a limited purpose) as if it had ultimately prevailed on the merits of its claims when in fact it has not yet done so. *See Doughtie & Co. v. Rutherford Cnty.*, No. 3-13-0209, 2013 WL 3995277, at *1 (M.D. Tenn. Aug. 5, 2013) ("Essentially, [the p]laintiff is asking the Court to order, on the 'front end' of this action, the relief it ultimately seeks in this lawsuit. The Court finds that [the p]laintiff has failed to show the need for this extraordinary relief.").[51]

For the various reasons set out herein, Plaintiffs have failed to carry their burden for this "extraordinary remedy." *Overstreet*, 305 F.3d at 573 (6th Cir. 2002) (citations omitted). Therefore, Plaintiffs' Motion (Doc. No. 55) is (as previously announced by the Court) DENIED.

IT IS SO ORDERED.

_Eli Richardson_____
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[51] Defendants also assert that Plaintiffs fail to allege a specific irreparable harm for each Plaintiff. (Doc. No. 57 at 11). Defendants elaborate that Plaintiffs do not, or cannot, establish a "collective harm" accruing to all Plaintiffs from the Sale because Plaintiffs' Complaint distinguishes between the Plaintiffs "actually owning" the Motorcoaches and the Plaintiffs merely "providing management and maintenance" to the Motorcoaches. (*Id.*). Defendants further assert that Plaintiffs' "unclean hands" bars the grant of Plaintiffs' requested injunctive relief. (*Id.* at 12-13).
  As the Court has denied the Motion, the Court notes, but declines to analyze, these arguments by Defendants.